CARLIN COMMUNICATIONS, INC., and Drake Publisher, Inc., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION, Respondent.

CARLIN COMMUNICATIONS, INC., Carbon Publishers, Inc., and Drake Publisher, Inc., Plaintiffs-Appellants,

v.

William French SMITH, as Attorney General of the United States, and Federal Communications Commission, Defendants-Appellees.

Nos. 270, 295, Dockets 84–4086, 84–6202.

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1984.

Decided Nov. 2, 1984.

Jonathan L. Rosner, New York City (Lawrence E. Abelman, Peter J. Lynfield, Marianne F. Murray, Abelman Frayne Rezac & Schwab, New York City, of counsel), for plaintiffs-appellants.

Bruce E. Fein, Gen. Counsel, F.C.C., Washington, D.C. (Daniel M. Armstrong, Sue Ann Preskill, Sharon Kelley, Steve Kaminer, Washington, D.C., of counsel), for defendants-appellees.

John Messenger, Washington, D.C. (Saul Fisher, Melvin A. Cohen, White Plains, N.Y., of counsel), for intervenors N.Y. Telephone Co. and New England Telephone Co.

Judith A. Maynes, G. Daniel McCarthy, New York City, for intervenor American Tel. & Tel. Co.

George Shapiro, James P. Mercurio, Gerald E. Oberst, Jr., Arent, Fox Kintner & Kahn, Washington, D.C., John S. Redpath, Jr., Harold Akselrad, New York City, Henry J. Gerken, Daniel J. Danser, Englewood, Colo., for amici curiae Home Box Office, Inc. and American Television and Communications Corp.

John J. Walsh, Brooklyn, N.Y., for amicus curiae Morality in Media, Inc.

Before OAKES, KEARSE, and PRATT, Circuit Judges.

OAKES, Circuit Judge.

Carlin Communications, Inc. provides a telephone "service," colloquially called "dial-a-porn," to local and long distance callers at ordinary rates. The callers hear prerecorded messages, which change several times daily as in the case of weather or sports results, describing actual or simulated sexual activity apparently in explicit terms. A dial-it service can receive up to 50,000 calls per hour to an individual number, and, rather incredibly, 800,000 calls per day were made to dial-a-porn in May, 1983; 180,000,000 calls in the year ending February, 1984. Dial-a-porn, accessible by calls to or in the Metropolitan New York area codes 212, 516, and 914, all to the 976 exchange, was far more popular than the horse-race results, the second most popular dial-it service, which received 79,000 calls

per day or 29,000,000 per year. Eighty percent of dial-a-porn calls are local, and twenty percent long distance.

Drake Publisher began offering dial-a-porn in the New York area in February of 1983. Carlin replaced Drake the following month and has since expanded to several cities, advertising the dial-a-porn numbers in adult-type magazines owned by Drake and Car-Bon Publishers, Inc. Under the New York leased-line tariffs, Carlin makes two cents per local or long distance call, and the telephone companies—for local calls, New York Telephone Co. and New England Telephone Co., now the NYNEX Telephone Companies (hereinafter NY-NEX), and for long distance calls, American Telephone & Telegraph Co. (hereinafter AT&T) and NYNEX—receive the remaining revenues.

The instant case is really two cases. In one, No. 84–4086, Carlin and Drake petition for review of an FCC rulemaking order or regulation[1] promulgated in response to a statute, 47 U.S.C.A. § 223(b) (Supp.1984,[2] mandating FCC action. In the second case, No. 84–6202, Carlin, Drake and Car-bon[3] appeal from the denial of a preliminary injunction against enforcement of section 223(b) by the United States District Court for the Southern District of New York, Constance Baker Motley, Chief Judge. We affirm the judgment in the appeal, No. 84–6202. We grant the petition to review in No. 84–4086 and set aside the regulation.

THE UNDERLYING STATUTE AND REGULATIONS

The drive to regulate dial-a-porn began when the County Executive for Suffolk County, New York, Peter F. Cohalan, com-menced an action against Carlin and the FCC in New York state court, since dismissed.[4] Subsequently Cohalan and a member of Congress, Thomas J. Bliley (R–Va.) sought to have the FCC terminate Carlin's dial-a-porn service by administrative action under then existing legislation, but the FCC concluded that federal law did not restrict dial-a-porn.[5] In light of the FCC's inaction, Congressman Bliley proposed an amendment to section 223 of the Communications Act, 47 U.S.C. § 223 (1982), as a rider to H.R. 2755, 98th Cong., 1st Sess. (1983), the FCC appropriations bill. The House Committee on Energy and Commerce agreed to Congressman Bliley's amendment to H.R. 2755 by voice vote on June 30, 1983, and reported the bill to the full House on September 15, 1983. The legislation prohibited obscene dial-a-porn service:

> Section 8 amends section 223 of the Communications Act of 1934 by adding a new subsection (b) ... that extends section 223's prohibition against obscene telephone calls to prerecorded messages. Obscene messages, whether made directly or by recording device, are prohibited without regard to whether the sender of the message initiated the call. The Committee intends that this section will prohibit obscene messages otherwise available over "Dial It" services.

H.R.Rep. No. 356, 98th Cong., 1st Sess. 19 (1983), U.S.Code Cong. & Admin.News 1983, pp. 2219, 2235.

■ With discussion on the floors of both Houses of Congress on November 18, 1983, the legislation was amended into its present form before being passed.[6] The

---

1. 49 Fed.Reg. 24,996, 25,003 (1984) (to be codified at 47 C.F.R. § 64.201).

2. Federal Communications Commission Authorization Act of 1983, Pub.L. No. 98–214, § 8, 97 Stat. 1467, 1469.

3. Hereinafter we use Carlin to refer to both the appellants in No. 84–6202 and the petitioners in No. 84–4086.

4. *Cohalan v. High Soc'y Magazine, Inc.,* No. 3490/1983 (N.Y.Sup.Ct.), dismissed for lack of

jurisdiction on removal, No. CV 83–603 (E.D. N.Y. Mar. 16, 1983).

5. *In re Application for Review of Complaint Filed by Peter F. Cohalan,* F.C.C. File No. E–83–14, Memorandum Opinions and Orders Adopted May 13, 1983, and March 5, 1984.

6. Section 223(b) as amended provides:
   (1) Whoever knowingly—
   (A) in the District of Columbia or in interstate or foreign communication, by means of telephone, makes (directly or by recording

amendment explicitly covered "indecent" language and authorized the FCC to promulgate defenses to the Act's coverage. 129 Cong.Rec. H10,559–60 (daily ed. Nov. 18, 1983); *id.* at S10,866–67. Congressman Bliley indicated that "indecent" was to be defined by *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (upholding FCC adjudication that specific broadcast was "indecent" as distinct from obscene).[7] On December 8, 1983, the legislation was signed by the President.[8]

device) any obscene or indecent communication for commercial purposes to any person under eighteen years of age or to any other person without that person's consent, regardless of whether the maker of such communication placed the call; or

(B) permits any telephone facility under such person's control to be used for any activity prohibited by subparagraph (A),

shall be fined not more than $50,000 or imprisoned not more than six months, or both.

(2) It is a defense to a prosecution under this subsection that the defendant restricted access to the prohibited communication to persons eighteen years of age or older in accordance with procedures which the Commission shall prescribe by regulation.

(3) In addition to the penalties under paragraph (1), whoever, in the District of Columbia or in interstate or foreign communication, *intentionally violates paragraph (1)(A) or (1)(B)* shall be subject to a fine of not more than $50,000 for each violation. For purposes of this paragraph, each day of violation shall constitute a separate violation.

(4)(A) In addition to the penalties under paragraphs (1) and (3), whoever, in the District of Columbia or in interstate or foreign communication, violates paragraph (1)(A) or (1)(B) shall be subject to a civil fine of not more than $50,000 for each violation. For purposes of this paragraph, each day of violation shall constitute a separate violation.

(B) A fine under this paragraph may be assessed either—

(i) by a court, pursuant to a civil action by the Commission or any attorney employed by the Commission who is designated by the Commission for such purposes, or

(ii) by the Commission after appropriate administrative proceedings.

(5) The Attorney General may bring a suit in the appropriate district court of the United States to enjoin any act or practice which violates paragraph (1)(A) or (1)(B). An injunction may be granted in accordance with the Federal Rules of Civil Procedure.

Section 8(c) of Pub.L. No. 98–214 mandated that:

The Federal Communications Commission shall issue regulations pursuant to Section 223(b)(2) of the Communications Act of 1934 (as added by subsection (a) of this section) not later than one hundred and eighty days after the date of the enactment of this Act.

**7.** While the views of a sponsor of legislation are by no means conclusive, they are entitled to considerable weight, particularly in the absence of a committee report. *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 526–27, 102 S.Ct. 1912, 1920–21, 72 L.Ed.2d 299 (1982). Congressman Bliley had this to say about the term "indecent" and *Pacifica, supra,* in his opening remarks in support of his amendment:

The amendment omits the terms "lewd, lascivious, filthy" from the section 8 of the bill. This change is merely to clarify that Congress intends to be consistent with Supreme Court rulings on obscenity which require a violation of community standards and an appeal to prurient interests. In *Manual Enterprises v. Day,* 370 U.S. 478 [82 S.Ct. 1432, 8 L.Ed.2d 639], Justice Harlan observed that though words such as these have different shades of meaning in common usage, they are all aimed at obnoxiously debasing portrayals of sex. Therefore, it is not necessary to keep the litany of terms as currently in the statute to prohibit that kind of material. It was necessary, however, to maintain the term "indecent" since the Supreme Court upheld the FCC's assessment of a fine based on indecent material in the Pacifica case.

I would observe as an aside that the ruling in Pacifica clearly affirms the FCC's ability and authority to examine material to determine whether it is obscene or indecent and to assess fines on that basis. This amendment clarifies that question and obviates the need for the FCC's pending inquiry on that issue, though I believe it was absurd for the FCC to ever consider their authority in that area questionable based on Pacifica.

129 Cong.Rec. H16,559 (Nov. 18, 1983).

**8.** Six days after the bill became law, Congressman Kastenmeier, a cosponsor of section 223(b), extended his remarks concerning the legislation in the Congressional Record:

Last, I would like to take issue with the restrictive interpretation by my colleague of the *regulations to be issued by the FCC under* section 223(b)(2) of my amendment. As noted in my own earlier remarks:

Congress intends that the FCC promulgate reasonable time, place, and manner restrictions calculated to restrict access to prohibited communications by persons under 18 years of age.

Under the Supreme Court's holding in *Butler v. Michigan,* 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957), Congress cannot expect

In the wake of section 223(b)'s passage, the Commission initiated notice and comment rulemaking proceedings. *See* 48 Fed. Reg. 43,348 (1983); 49 Fed.Reg. 2124 (1984). On June 4, 1984, the Commission issued a Report and Order, 49 Fed.Reg. 24,996 (1984), containing the legislatively mandated regulation establishing defenses to prosecution under section 223(b). The regulation, *id.* at 25,003, provides:

It is a defense to prosecution under Section 223(b) of the Communications Act of 1934, as amended, 47 U.S.C. § 223(b) (1983), that the defendant has taken either of the following steps to restrict access to communications prohibited thereunder:

(a) Operating only between the hours of 9:00 p.m. and 8:00 a.m. Eastern Time or

(b) Requiring payment by credit card before transmission of the message(s).

Subsection (a) is intended to regulate dial-a-porn services, while subsection (b) is intended to regulate live telephone services providing sexually explicit conversation, which require payment by charge or credit card. Subsection (b) cannot be relied upon by dial-it services because a dial-it caller does not pay "before transmission of the message."

CONTENTIONS OF THE PARTIES AND AMICI

Carlin levels several challenges at the time-channeling regulation. Carlin argues that it is (A) violative of the First Amendment's requirement that a restriction on protected speech be the least restrictive alternative for protecting a compelling governmental interest, (B) either impermissibly overbroad or vague, (C) arbitrary and capricious because the FCC had no legitimate reason for allowing live services to use credit cards and not allowing dial-it services to use automated access codes, and (D)

in conflict with common carrier tariffs that require continuous, uninterrupted automatic announcement and recorded program services. Carlin also argues that the statute is vague and overbroad by, inter alia, its proscription of "any obscene or indecent communication." The statute is also said to create an impermissible national standard of obscenity and to constitute an unconstitutional delegation of lawmaking authority.

The Commission counters each of Carlin's claims, arguing, in particular, that the regulatory scheme does not violate the First Amendment because the Commission reasonably rejected as ineffective or impractical other suggested methods for restricting access to dial-a-porn.

The NYNEX Companies, intervenors, argue that the FCC properly rejected proposals for automatic screening and blocking of calls to dial-a-porn services and that the time-channeling regulation does not conflict with telephone company tariffs. AT&T, another intervenor, argues that the FCC did not violate rules prohibiting ex parte contacts by meeting with telephone company representatives on April 16, 1984, to review telephone industry blocking capabilities and that the FCC did not act arbitrarily or capriciously in determining that the industry lacked the capability of effectively blocking calls at customers' request. Home Box Office, Inc., and American Television and Communication Corp., amici, argue that section 223(b) is unconstitutionally overbroad because its coverage is not limited to expression that is obscene under *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Morality in Media, Inc., amicus, argues essentially that the time-channeling regulation is ineffective and fails to satisfy Congress's mandate.

the FCC to impose blanket restrictions on dial-a-porn services if time, place, and manner restrictions are technically infeasible or impracticable. ... [W]e have carefully constructed section 223, as amended, to avoid reducing the adult population to hearing only what is fit for a child. We leave it to the FCC to prescribe the specific regulations that per-

mit adult access while limiting children's access. If, however, no such regulations are feasible, then less restrictive measures rather than broader restrictions will have to suffice to avoid any constitutional infirmity.
129 Cong.Rec. E5966–67 (daily ed. Dec. 14, 1983).

### Discussion

■ In any constitutional case we start with the prudential consideration perhaps best set forth by Justice Brandeis in his concurring opinion in *Ashwander v. Tennessee*, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936), that courts should not "anticipate a question of constitutional law in advance of the necessity of deciding it," *id.* at 346–47, 56 S.Ct. 482–83 (quoting *Liverpool, New York & Philadelphia Steamship Co. v. Commissioners of Emigration*, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885), and citing in text or footnote numerous other cases). Thus, if the FCC regulation is invalid facially or as applied, we need not reach the question of the constitutionality of the underlying statute, which makes it a defense, 47 U.S.C. § 223(b)(2), that the putative defendant "restricted access to persons eighteen years of age or older in accordance with procedures" prescribed by the Commission's regulation. Congress surely did not intend that the statute be enforced without a valid regulation in place. The Justice Department seemed to recognize that the statute was unenforceable absent such a regulation when it advised the district court that it "does not anticipate seeking to enforce subsection (b) of 47 U.S.C. § 223 until the pertinent FCC regulations have been promulgated." Letter of Lawrence Lappe, Chief of General Litigation and Legal Advice Section, Criminal Div., U.S. Dep't of Justice (Dec. 21, 1983). While the letter is couched in qualified terms, its purport would seem to reflect Congress's intent.

Thus we look first to the validity of the time-channeling regulation.

Justice Brandeis's caution against considering constitutional questions does not allow us to avoid determining whether the regulation violates the First Amendment, for each of Carlin's nonconstitutional challenges to the regulation fails. While the FCC failed to allow a substantial period of time for comments in response to its ex parte discussions with the telephone company representatives, the procedures attending those discussions cannot be said to run afoul of either the FCC's own regulations or general principles of administrative procedure for notice and comment rulemaking.[9] In addition, Carlin's tariff concerns are assuaged by NYNEX's argument, concurred in by the FCC, that a recorded message informing callers that sexually suggestive messages are transmitted after 9:00 p.m. would satisfy the tariff. Finally, whatever the problems with the FCC's regulatory determinations, they do not rise to the level of arbitrariness or capriciousness. The FCC had legitimate reasons for distinguishing between the use of credit cards by live pornographical telephone services and the use of credit cards or access codes by dial-a-porn. The live services require payment by credit card. Thus, the credit card regulation engenders no extra costs as applied to live services. Dial-a-porn cannot use credit cards. While it might use an automated access code, any automated access code system would surely impose costs on users, on the services, or perhaps

9. The Commission met ex parte with telecommunications industry representatives on April 16, 1984, to discuss the difficulty and cost of implementing blocking and screening schemes. The Commission's ex parte rules, 47 C.F.R. § 1.1231 (1983), adopted in response to *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 51–59 (D.C. Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), specifically permit ex parte contacts in informal rulemaking proceedings, such as this one, until an item is placed on the Commission's meeting agenda. In fairness to parties who are not included in the ex parte meeting, the rules require that a summary of the subject of the meeting be placed in the record, 47 C.F.R. § 1.1231(b)(2), and that the meeting's occurrence be reflected in a public notice, *id.* § 1.1231(b)(4). Both steps were taken here. *See* FCC Public Notice, No. 4052 (May 8, 1984). Indeed, the Commission went further and placed a transcript of the meeting in the record. We note, however, the public notice that information had been received ex parte, that summaries of it were available, and that responses were invited was not made until May 8, 1984, less than a month before the regulations were announced. This timetable suggests that anyone, including Carlin, had little time to react to the ex parte material. It also offers indirect evidence tending to indicate that the FCC's rulemaking was rushed, doubtless due in part to the 180-day congressional injunction, making its investigation somewhat superficial.

on the carriers. Moreover, live services presumably have operators taking credit card numbers; an automated access code system would not. Treating live and dial-it services differently is not arbitrary and capricious.

Turning to the constitutionality of the regulation, we first assume that Carlin is injured by the regulation of indecent speech. We have to make this assumption because our record, while replete with descriptions of the telephone messages, is singularly devoid of information as to their actual content except for three such messages attached to a complaint by Congressman Bliley. *See supra* note 5. The assumption is not inappropriate given the vagaries of the line distinguishing between obscene and indecent speech. With this assumption, we address whether time-channeling is a constitutionally valid means of regulating the kind of speech this regulation seeks to cover.

We recognize that the Supreme Court has usually viewed freedom of expression contextually. Thus, while it has said that obscene "material" is "unprotected" by the First Amendment, *Miller*, 413 U.S. at 23, 93 S.Ct. at 2614; *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 54, 93 S.Ct. 2628, 2633, 37 L.Ed.2d 446 (1973), it has emphasized that regulatory schemes designed to regulate obscene materials must be "carefully limited" because of the "inherent dangers of undertaking to regulate any form of expression." *Miller*, 413 U.S. at 23–24, 93 S.Ct. at 2614–2615. The Court has also suggested that different (and less restrictive) constitutional limits apply to legislation that prohibits the distribution of certain material to young persons but does not directly infringe upon the right of adults to obtain materials they wish to see. *See Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968). So, too, the Court has distinguished between legislation that deals with public displays, unsolicited mailings, or other conduct "thrusting" sexual materials upon those who do not want them, which constitute "an assault upon individual privacy," *Redrup v. New York*, 386 U.S. 767, 769, 87 S.Ct. 1414, 1415, 18 L.Ed.2d 515 (1967), and legislation that regulates the private viewing of sexual material, *Redmond v. United States*, 384 U.S. 264, 265, 86 S.Ct. 1415, 1416, 16 L.Ed.2d 521 (1966) (obscene private correspondence); *cf. Stanley v. Georgia*, 394 U.S. 557, 568, 89 S.Ct. 1243, 1249, 22 L.Ed.2d 542 (1969) (private possession of obscene matter cannot constitutionally be made a crime). *But cf. United States v. Orito*, 413 U.S. 139, 143–44, 93 S.Ct. 2674, 2677–78, 37 L.Ed.2d 513 (1973) (upholding prohibition of transportation in interstate commerce of obscene materials by common carrier, whether for private or commercial purposes); *California v. LaRue*, 409 U.S. 109, 117–18, 93 S.Ct. 390, 396–97, 34 L.Ed.2d 342 (1972) (nude dancing in bars regulable under Twenty-first Amendment); *Ginzburg v. United States*, 383 U.S. 463, 475–76, 86 S.Ct. 942, 949–50, 16 L.Ed.2d 31 (1966) (dubiously obscene material treated as obscene when advertised as erotically appealing). Similarly, the Court has, in some cases, looked to the form in which the expression is cast, be it book, magazine, movie, play, or T-shirt, giving books a "preferred place in our hierarchy of values," because they contain "the printed word," *Kaplan v. California*, 413 U.S. 115, 119, 93 S.Ct. 2680, 2684, 37 L.Ed.2d 492 (1973) (but where a book is "made up entirely of repetitive descriptions of physical, sexual conduct, 'clinically' explicit and offensive to the point of being nauseous," *id.* at 116–17, 93 S.Ct. at 2682–83, distribution even to an adult may be criminalized). Finally, the Court has been sensitive to whether a regulatory scheme operates as a prior restraint on speech. *See, e.g., Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546, 552–53, 95 S.Ct. 1239, 1243–44, 43 L.Ed.2d 448 (1975) (holding that denial of use of municipal auditorium for a production because of its content constitutes a prior restraint and violates the First Amendment because of a lack of procedural safeguards).

We also pay heed to the plurality opinion of the Court in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 63–70, 96 S.Ct. 2440, 2448–2452, 49 L.Ed.2d 310 (1976) (plu-

rality opinion) (upholding adult-film zoning ordinances), that the content of expression is, or may be, relevant in First Amendment analysis, although "[t]he sovereign's agreement or disagreement with the content of what a speaker has to say may not affect the regulation of the time, place or manner of presenting the speech," *id.* at 64, 96 S.Ct. at 2449. At the same time, we are mindful of the teaching of *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980) (citations and footnote omitted):

> A restriction that regulates only the time, place, or manner of speech may be imposed so long as it is reasonable. But when regulation is based on the content of speech, governmental action must be scrutinized more carefully to ensure that communication has not been prohibited "merely because public officials disapprove the speaker's views." ... As a consequence, we have emphasized that time, place, and manner regulations must be "applicable to all speech irrespective of content." ... Governmental action that regulates speech on the basis of its subject matter " 'slip[s] from the neutrality of time, place, and circumstance into a concern about content.' " ... Therefore, a constitutionally permissible time, place, or manner restriction may not be based upon either the content or subject matter of speech.

Finally, we note the Court's recent reaffirmation of the holding in *Butler v. Michigan,* 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957), that "the government may not 'reduce the adult population ... to reading only what is fit for children.' " *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 2884, 77 L.Ed.2d 469 (1983) (quoting *Butler v. Michigan,* 352 U.S. at

383, 77 S.Ct. at 526). The *Bolger* Court, 103 S.Ct. at 2884, also reiterated the language of *Pacifica* that "emphasiz[es] the narrowness of [its] holding," 438 U.S. at 750, 98 S.Ct. at 3041, and highlighted the adverb "uniquely" in the *Pacifica* explanation that broadcasting is "uniquely pervasive" and "uniquely accessible to children, even those too young to read," 438 U.S. at 748, 98 S.Ct. at 3040. *Bolger* thus singles out the broadcasting media as subject to a "special interest of the federal government in regulation" that "does not readily translate into a justification for regulation of other means of communication." 103 S.Ct. at 2884.

With this constitutional background in mind, we assess the time-channeling regulation. We begin by noting that the regulation does not warrant the special treatment that the Court has espoused in some contexts. The regulation concerns a telephone service that requires dialing on the part of the would-be listener, as opposed to a public display, an unsolicted mailing, or other means of expression as to which the receiver has no chance to withhold his or her consent.[10] Moreover, the telephone transmits the spoken word, not photographs, moving pictures, or live performances.[11] And, while the aim of the regulation is to limit or prevent access by minors to dial-a-porn messages, its operative effect is to deny access to adults as well. Finally, for the reasons cited by the Court in *Bolger,* it may well be that the Court's holding in *Pacifica* is inapplicable outside the broadcast context.

▪ We must reject the FCC's argument that the regulation should be upheld as a reasonable time, place, or manner restriction. Until better informed, we are required to recognize a certain inconsisten-

---

**10.** Although an unconsenting adult may call dial-a-porn by accident or as the result of a practical joke, the caller can avert his or her ear. Moreover, the regulations are not aimed at this problem. At oral argument the FCC General Counsel stated that the statute's knowingly requirement protected Carlin from prosecution on the basis of wrong numbers. Yet this interpretation proves too much; it would protect

Carlin from any prosecution. If Carlin does not act knowingly with respect to wrong numbers, it does not act knowingly with respect to minors.

**11.** As we have said, we are not concerned here with live services, which requires payment by credit card.

cy between the language of the *American Mini Theatres* plurality, pointing out the frequent necessity of looking at the content of expression to determine its regulability, and the Court's language in *Consolidated Edison,* calling for a higher standard of scrutiny than reasonableness when a regulation is based on the content or subject matter of speech. For the present, we follow the *Consolidated Edison* approach, noting that, while the Court has stated that "[t]he question whether speech is, or is not, protected by the First Amendment often depends on the content of the speech," *New York v. Ferber,* 458 U.S. 747, 763, 102 S.Ct. 3348, 3358, 73 L.Ed.2d 1113 (1982) (quoting *American Mini Theatres,* 427 U.S. at 66, 96 S.Ct. at 2450), a majority of the Court has never accepted the view that courts should establish a hierarchy of categories of protected speech. We take it as a given that the state cannot stifle speech because it disagrees with the speaker's view. Every content-based regulation thus should be reviewed under a stricter scrutiny than that of reasonableness because of the difficulty under *American Mini Theatres,* 427 U.S. at 67, 96 S.Ct. at 2451, of determining whether the state is simply "hostile" to the speaker's point of view. Thus, because the regulation is content based—it does not apply to all dial-it services, but only to those transmitting obscene [12] or indecent messages—we scrutinize it more closely.

Under this more exacting scrutiny, we must determine whether the regulation precisely furthers a compelling governmental interest. The interest in protecting minors from salacious matter is no doubt quite compelling. *See Ginsberg, supra.* Such an interest must be served, however, only by "narrowly drawn regulations," *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980), that is, by employing means "closely drawn to avoid unnecessary abridgment," *Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 638, 46 L.Ed.2d 659 (1976). The Government bears the heavy burden of demonstrating that the compelling state interest could not be served by restrictions that are less intrusive on protected forms of expression. *See Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 74, 101 S.Ct. 2176, 2185, 68 L.Ed.2d 671 (1981). And the State may not regulate at all if it turns out that even the least restrictive means of regulation is still unreasonable when its limitations on freedom of speech are balanced against the benefits gained from those limitations. For example, a statute may be unconstitutional even in the absence of an identifiable less restrictive means if there is "no substantially relevant correlation between the governmental interest asserted and the state's" regulatory scheme. *First National Bank v. Bellotti,* 435 U.S. 765, 795, 98 S.Ct. 1407, 1426, 55 L.Ed.2d 707 (1978) (quoting *Shelton v. Tucker,* 364 U.S. 479, 485, 81 S.Ct. 247, 250, 5 L.Ed.2d 231 (1960)).

▮ In the present case, the FCC has failed adequately to demonstrate that the regulatory scheme is well tailored to its ends or that those ends could not be met by less drastic means. On one hand, the regulation is both overinclusive and underinclusive. As noted above, the regulation denies access to adults between certain hours, but not to youths who can easily pick up a private or public telephone and call dial-a-porn during the remaining hours. And apparently they do not prohibit Carlin from publishing a continual message suggesting a call-back for explicit sex-talk at the appropriate hour and putting youth on notice about when to call back. Moreover, the record before us offers little that demonstrates why a prohibition on dial-it services is needed during daytime school hours when children are for the greater part of the year likely to be in class under adult supervision, while the prohibition is not needed after 9:00 p.m. Eastern Time (6:00 p.m. on the West Coast), when a young person needs to be unsupervised for only about ninety seconds in order to dial the number and hear the message.

---

**12.** Of course, Congress and the Commission have a much freer hand with regulating obscene speech, which is not protected by the First Amendment.

On the other hand, the rulemaking record does not show that time channeling is the least restrictive method for protecting youths from dial-a-porn. The FCC expressly rejected certain alternatives, but the record provides minimal explanation for why screening or blocking or using access numbers would not be both more effective in limiting the dial-it audience to those over the age of eighteen and less restrictive of adults' freedom to hear what they want when they want to hear it.

One approach suggested by commenters during the rulemaking process involved giving subscribers the option of blocking access to certain telephone numbers from their premises.[13] As the Commission said, "Since neither the Government nor common carriers would be burdened with the responsibility of making obscenity determinations under this approach, First Amendment problems would be avoided." 49 Fed. Reg. at 24,998–99. The Commission Report and Order noted that "[s]ubscriber screening schemes may be accomplished either by: (1) The installation of appropriate capability within the local telephone company's central office ... or (2) The development of a screening function within terminal equipment at the customer's premises." Id. at 24,999. The FCC rejected both options on the basis of comments by the telephone industry. The Commission found that a blocking or screening scheme, whether implemented from the telephone company's central office or customers' premises would require time to develop and could entail costs that would outweigh the benefits to be obtained, so

that such schemes do not "at this time, represent viable regulatory option[s]." Id.

The telephone industry commenters indicated that central-office blocking would require extensive modifications to existing equipment. "It appears," according to the FCC, "that central-office equipment currently in use is incapable of selective screening or blocking on an entire seven or ten digit basis," id., so that any attempt to provide such a service would first require the development and implementation of special facilities for that purpose. But the Commission does not refer to the option of simply blocking all "976" calls.[14]

The FCC rejected a blocking device installed in telephone equipment at the customers' premises because it required "the development and installation of new equipment." Id. According to industry commenters, "no existing commercial device has a screening capability that could be deployed within the subscriber's terminal equipment." Id. Yet certain federal buildings actually have blocked all 976 calls,[15] at least since substantial billings were run up in calls from certain Washington offices to dial-a-porn. If the "architecture" of the system works here, why not elsewhere? The record should analyze every option.[16]

Another approach suggested by commenters was that access to dial-a-porn be restricted by requiring each caller to provide an access number for identification to an operator or computer before receiving the message. Because dial-it services function by allowing multiple callers virtually unlim-

---

**13.** The Commission noted that "[t]his method is analogous to a scheme used by the postal service whereby individuals may request material that they consider 'to be erotically arousing or sexually provocative' not be delivered." 49 Fed. Reg. at 24,998–99 (quoting 39 U.S.C. § 3008 (1982)).

**14.** Blocking 976 exchange calls raises other problems. In order to prevent calls to the dial-a-porn numbers the subscriber would not be able to receive the weather dial-it service or other concededly First Amendment protected information. Nevertheless, without intimating our views were such a regulation adopted, the subscriber would make the choice.

**15.** This information was not in the record but was provided during oral argument.

**16.** During the ex parte discussion between the FCC and the telecommunication industry representatives, the participants expressed concern about the cost of screening to the customer. Yet we do not see why the financial burden could not be placed on dial-it services. For example, an alternative regulation might provide a defense to dial-it services that provide screening devices to telephone customers who request the installation of such devices.

ited simultaneous access to prerecorded messages, requiring operator intervention was thought to be economically impracticable. *Id.* at 25,000. The Commission rejected an automatic access code system not by questioning its technical feasibility [17] but by noting that it "would place substantial economic and administrative burdens on recorded service providers." *Id.* While Carlin argued that the interposition of an automated access or identification code system would be unpalatable administratively and financially prohibitive, we see no great administrative difficulty in having each person who desired access to dial-a-porn services fill out some type of application form, which would then be sent to the appropriate dial-a-porn message service provider who would have to rely on some system of age verification.[18] We recognize, as did the Commission, that the inconvenience associated with this practice might discourage many adults from using the service, and thereby conceivably place its financial viability in jeopardy. We also recognize that such a system would impose burdens upon those adults who do not have access or identification codes but wish to patronize dial-a-porn services, but we need not determine whether this alternative regulatory scheme would present insuperable constitutional problems. The FCC embraced the time-channeling scheme in the face of an argument by Carlin that it will have a disastrous financial effect, by noting that there is no evidence that callers will not call after 9:00 p.m., but rejected the automated access code scheme, by accepting Carlin's argument that the scheme jeopardized Carlin's financial viability.[19] The Commission did not make the crucial determination about which scheme would be less restrictive of freedom of expression.

Certainly the FCC cannot successfully counter Carlin's challenges by arguing that Carlin did not urge these alternative methods of regulation at the rulemaking stage. The FCC's rules apply to everyone and must stand on their own. The FCC must give us a record that shows, convincingly, that the regulations were chosen after thorough, careful, and comprehensive investigation and analysis. Our unanswered questions at oral argument and in this opinion suggest that the FCC has fallen short of that high, but necessary, standard.

In light of our holding, we need not address Carlin's other constitutional challenges to the regulation or its challenges to the facial validity of section 223(b). And while the Government has not stated that it will not enforce the statute after the time-channeling regulation has been set aside, we presume that the Justice Department will continue its earlier policy of not enforcing section 223(b) without a regulation governing dial-a-porn. If the Government does restate its earlier policy, a preliminary injunction is surely inappropriate because of a lack of irreparable injury to Carlin.[20]

---

**17.** It should be noted that NYNEX, in its brief, suggests that an automated access code system is infeasible. The FCC, however, did not make an assessment of or rely on NYNEX's claim. *See* 49 Fed.Reg. at 25,000.

**18.** Perhaps a system of age verification would not be necessary. After all, parents do have "substantial control over the disposition of mail once it enters their mailboxes." *Bolger,* 463 U.S. at ——, 103 S.Ct. at 2884. An access code sent to a child would presumably be intercepted by his or her parents.

**19.** Dial-a-porn use between the promulgation of the regulation and this decision may provide Carlin and the FCC with data to test the FCC's position. As the FCC acknowledges, any regulation that drives Carlin out of business would seem to fall under *Butler v. Michigan.*

**20.** Arguably, in these circumstances, the district court did not go far enough, as it might have dismissed the complaint. As we recently noted in *Seafarers Int'l Union v. United States Coast Guard,* 736 F.2d 19, 26 (2d Cir.1984): "Ripeness ... requires a twofold inquiry evaluating the hardship to the parties of withholding judicial determination and evaluating whether the issues are fit for judicial determination." An explicit policy of nonenforcement suggests that withholding judicial consideration causes no hardship to Carlin, and the incomplete regulatory scheme shows that the issues are not "fit for judicial determination." Where the Government does not intend to prosecute, there is no justiciable "case or controversy." *See O'Shea v. Littleton,* 414 U.S. 488, 493–94, 94 S.Ct. 669, 674–75, 38 L.Ed.2d 674 (1974); *St. Martin's Press, Inc. v. Carey,* 605 F.2d 41, 44 (2d Cir. 1979); 13 C. Wright, A. Miller & E. Cooper,

Petition to review granted and regulation set aside. Judgment of the district court affirmed.

*Federal Practice and Procedure* § 3532, at 241 (1975). However, the Government's letter here was sufficiently equivocal and not expressly ap-plicable to the regulation's being held invalid, as here, so that dismissal of the complaint was, and is at present, unnecessary.