461 So.2d 1208 (1984)
CARLIN COMMUNICATIONS, INC.
v.
SOUTH CENTRAL BELL TELEPHONE CO.
No. CA-2489.
Court of Appeal of Louisiana, Fourth Circuit.
December 14, 1984.
Rehearing Denied January 24, 1985.
*1209 Michael S. Fawer, Marie O. Riccio, Fawer, Brian, Hardy & Zatzkis, New Orleans, for plaintiff-appellee Carlin Communications, Inc.
Charles W. Lane, III, Veronica A. Cubit, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, and George W. Byrne, Jr., New Orleans, for defendant-appellant South Central Bell Telephone Company.
Before REDMANN, C.J., and GARRISON and KLEES, JJ.
*1210 KLEES, Judge.
This is an appeal of two separate orders relating to preliminary injunctions. On March 27, 1984, appellee Carlin Communications, Inc. (Carlin) sought injunctive relief in the Orleans Parish Civil District Court against the threatened termination of its Dial-It telephone service by appellant South Central Bell (SCB). Carlin feared termination because the tariff under which the Dial-It service was operated allowed SCB to discontinue a subscriber's service any time the subscriber transmitted a message that SCB deemed "obscene or sexually explicit." Carlin claimed that this portion of the tariff was unconstitutional. After an adversary hearing, the district court refused to issue the injunction, holding that the recorded message Carlin intended to transmit to its Dial-It service customers was patently obscene and therefore devoid of constitutional protection.
Two days later, Carlin transmitted over its service a message essentially similar to the one the court had termed obscene, and SCB immediately disconnected Carlin's Dial-It service. Claiming that this transmission was the result of a clerical error, Carlin sought a preliminary injunction ordering SCB to reinstate its Dial-It service. This time, the district court issued the injunction, holding that the SCB tariff was unconstitutional to the extent that it would permit the telephone company to terminate a subscriber's Dial-It service on the basis of a single tariff violation caused by clerical error. In addition to ordering Carlin's service reinstated, however, the district court ordered that civil penalties in the amount of $20,000 per day plus $1 per message be imposed if Carlin ever again transmitted a message of the type that the court had declared obscene.
Carlin and SCB are each appealing both rulings of the lower court. SCB asserts not only that its tariff provision is constitutional, but also that the district court erred in its initial determination, made after the first hearing, that SCB's actions pursuant to the tariff constituted "state action" for purposes of the 14th Amendment. Carlin, on the other hand, asserts that the penalties prescribed by the district court pose an unconstitutional restraint on its freedom of speech, and also that the court erred in refusing to enjoin SCB from disconnecting Carlin's Dial-It service.
The issues presented on appeal are: (1) Whether SCB's termination of Carlin's Dial-It service constitutes "state action"; (2) Assuming state action, whether the tariff provision that authorizes SCB to discontinue a subscriber's Dial-It service upon the transmission of a sexually explicit message is constitutional; and (3) Whether this tariff provision has been preempted by federal law. This court finds that SCB's action must be considered "state action" for purposes of the 14th Amendment. Furthermore, we find that the tariff pursuant to which SCB acted is not in violation of the constitution, nor is it preempted by federal law.

FACTS
SCB is a public utility regulated by the Louisiana Public Service Commission (LPSC); the services it provides and the rates it charges within Louisiana are governed by tariffs on file with the Commission. LSA-R.S. 45:1161 et seq. Insofar as it deals in interstate and foreign communications, SCB is also a common carrier subject to the jurisdiction of the Federal Communications Commission (FCC). 47 U.S.C. § 151 et seq.
Carlin is a New York corporation engaged in the business of providing "Dial-It" telephone service to telephone company customers throughout the nation. Dial-It, a trademark of AT & T, allows an information provider such as Carlin to contract with the local telephone company for one or more access lines which, when connected to equipment located on the information provider's premises, permit callers to receive pre-recorded messages. The caller is charged a predetermined amount for the call (e.g., 50 cents), which appears on his local phone bill; periodically, the phone company remits a specified percentage of this revenue to the Dial-It subscriber. Well-known examples of Dial-It services include *1211 Time, Weather, Dow Jones stock market quotations, Dial-a-Prayer and Diala-Joke.
In 1983, SCB began considering offering local Dial-It service in the New Orleans area (Area Code 504), which would require amending its General Subscriber Services Tariff on file with the LPSC. About this time, SCB began having discussions with Carlin as a potential Dial-It subscriber. The evidence suggests that Carlin knew from the inception of these discussions that South Central Bell would not permit operation of a Dial-It line similar to Carlin's High Society Hotline in New York, which transmits sexually explicit messages. (SCB exhibit 4, Ltr. 8/11/83). On January 11, 1984, SCB submitted to the LPSC an amendment to the General Subscriber Services Tariff pertaining to Local Dial-It service, which was accepted and became effective on January 31, 1984. On February 1, 1984, Carlin sent SCB a check as advance payment for the establishment of Dial-It service and enclosed a list of programs Carlin intended to put in operation as soon as facilities became available. The programs listed, in order of priority, were (1) Info Line976-2727; (2) Quiz Line976-9467; (3) Telesports976-4444; (4) News Line976-2626; and (5) Hope Line976-4673.
(SCB Ex. 9, Ltr. 2/1/84). Several weeks later, SCB advised Carlin that the tariff on file with the LPSC prohibited dissemination of recorded messages containing sexually explicit material. (SCB EX. 10, Ltr. 2/22/84). On March 1st, SCB acknowledged Carlin's order of local Dial-It service and set forth the applicable fees; SCB also enclosed a copy of the amended tariff. (SCB Exs. 11 & 12, Ltrs. 3/1/84). On or about March 27th, Carlin initiated its first Dial-It service in the New Orleans area, using telephone number 976-2727. On the same day, Carlin filed suit seeking to restrain SCB from enforcing the conditions of its tariff, which reads, in pertinent part:
The subscriber has exclusive responsibility and control over the content, quality and characteristics of speech used in the recording.... The subscriber shall exclude from the message or announcement any matter the dissemination of which is prohibited by law. Since neither the Company nor the subscriber can control access to the subscriber's messages by the general public, including minors, no message which, in the opinion of the Company, contains material of an obscene or sexually explicit nature shall be permitted on Local Dial-It Service. The dissemination of obscene or sexually explicit messages by a subscriber shall be grounds for immediate discontinuance of subscriber's service without advance notice, and the Company shall have no liability, in tort or contract, to anyone as a result of its action in this regard.

PROCEEDINGS IN THE DISTRICT COURT
On April 17, 1984, a hearing was held on Carlin's request for declaratory and injunctive relief. Initially, the district court noted that unless Carlin intended to transmit messages unlike what it had used so far, there was "nothing to enjoin," as the socalled mildly suggestive messages then in use were admittedly not obscene. Mr. Lawrence Abelman, a representative of Carlin, then introduced a transcript of a message being played over Carlin's New York line and testified that Carlin intended to use this message or something similar to it in New Orleans. Mr. Elbert Balch, a SCB account executive in charge of Dial-It service marketing, later testified that if he encountered this message in the course of monitoring Carlin's lines, he would consider it a possible violation of the tariff and would refer it to SCB management for a decision regarding further action to be taken.
At the conclusion of the hearing, the district court denied Carlin's request for a preliminary injunction. In its Reasons for Judgment, the court found that: (1) The action of SCB constituted "state action" for purposes of the 14th Amendment; (2) The message introduced by Carlin as Exhibit A at the hearing was patently obscene and therefore devoid of constitutional protection; *1212 and (3) The issue of whether SCB's tariff constituted an impermissible prior restraint on free speech had been obviated by the court's finding that the message Carlin intended to use was obscene.
On May 4, 1984, two days after the district court had rendered judgment, a SCB employee dialed the Carlin number and heard a message essentially similar to the one the court had declared obscene. At 2:00 p.m. that day, after giving Carlin one hour's notice, SCB disconnected Carlin's Dial-It service. Carlin returned to the district court, this time seeking a preliminary injunction ordering SCB to restore the service. Counsel for Carlin claimed that the transmission of the obscene message was merely a clerical error on the part of a Carlin employee; that Carlin intended to continue using only the "mildly suggestive" messages unless and until the court's decision was overturned; and that the termination of its Dial-It service due to a single transmission of an obscene message violated Carlin's constitutional rights. In the face of this testimony, the district court ordered SCB to reinstate Carlin's service, holding that the tariff was unconstitutional to the extent that it would permit termination of a subscriber's service based on a single instance of tariff violation. However, in order to protect the public from further transmissions of obscene material, the court required Carlin to post a $100,000 bond, and also set penalties of $20,000 per day plus $1 per message to be imposed if Carlin ever again transmitted a message similar to the one the court had judged obscene.

LAW

I. STATE ACTION
Because private conduct is immune from the restrictions of the 14th Amendment, this court must first find "state action" before it may address Carlin's constitutional complaints. In arguing that its termination of Carlin's Dial-It service was not state action, SCB relies upon Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), in which the Supreme Court determined that a utility company's termination of plaintiff's electrical service for non-payment of bills was not state action. Jackson does stand for the proposition that every act of a heavily-regulated utility possessing a state-granted monopoly and functioning pursuant to tariffs filed with the state does not necessarily amount to state action. However, the crux of the Supreme Court's opinion is an inquiry into the nature of the particular act complained of. The court states:
But the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself....
* * * * * *
If we were dealing with the exercise by Metropolitan of some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one.
419 U.S. at 351-53, 95 S.Ct. at 453-54 (Emphasis added).
In Jackson, the utility company cut off plaintiff's electricity to serve its own private economic interest. By contrast, SCB censored Carlin's phone messages to protect the public interest. (SCB Ex. 13, Ltr. 1/11/84). The stated purpose of the tariff's prohibition of sexually explicit messagtes is to prevent minors from gaining access to such material. The protection of minors from exposure to obscenity is ordinarily a state concern. Thus, SCB is exercising a state function. This fact provides the nexus between SCB's action and the state that was missing in Jackson. Therefore, we hold that SCB's termination of Carlin's Dial-It service constitutes state action and is thus subject to the scrutiny of the 14th Amendment.

II. CONSTITUTIONALITY OF THE TARIFF
Carlin contends that the tariff provision which authorized SCB to disconnect its service is an impermissible prior restraint on *1213 its right of free speech; is vague and overbroad; and is a violation of the constitutional right of privacy. This court disagrees.

A. PRIOR RESTRAINT
It is well settled that obscenity is not protected by the First Amendment right of free speech. Miller v. California, 413 U.S. 15, 23, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973). SCB disconnected Carlin's Dial-It line only after Carlin transmitted a recorded message of the type that the district court judge had already declared to be obscene. Therefore, the doctrine of prior restraint, which concerns the right to an adversary hearing on the question of obscenity before material is censored, is not really at issue here. This point was made by the trial judge in his Reasons for Judgment following the initial hearing.
Nevertheless, Carlin claims that it is entitled to a prior adversary hearing on each individual message, and that it is insufficient for the court to proscribe, as the trial judge did, all messages of the same type as the one placed in evidence. Carlin relies on Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), in which the Supreme Court invalidated a Maryland statute requiring submission of all motion pictures to the State Board of Censors before the films were exhibited. Freedman states that a statute or regulation involving a prior restraint will be condemned if: (1) Once the censor disapproves of the material, the speaker, rather than the censor, has the burden of going to court to prove the film is not obscene; (2) Once the censor has acted against the film, its exhibition is prohibited pending judicial review, however protracted; and (3) The statute provides no assurance of prompt judicial determination. 85 S.Ct. at 739. Carlin asserts that because the SCB tariff possesses these three characteristics, it is unconstitutional. We find this assertion to be without merit.
The instant situation differs from the Freedman case in at least two key ways. First, the Freedman court felt that the burden of proof should fall on the censor because "a censor's business is to censor," thereby creating a danger that the censor may be less responsive to the constitutional interest in freedom of speech. 85 S.Ct. at 738. This case, however, does not involve a censorship board. SCB is in the business of providing telephone service; censorship of these recorded messages is an incidental function. Once Carlin has transmitted a message essentially similar to one it knows was judicially determined to be obscene, there is no reason Carlin should not be required to bear the burden of going to court and proving that the second message is protected.
A second, more important distinction between this case and Freedman concerns the nature of the state interests involved. Because the Freedman court was dealing with motion pictures, it did not have to concern itself with the protection of minors from exposure to the films; minors can easily be barred from objectionable films. By contrast, SCB's major concern in censoring these telephone messages is to prevent children from gaining access to them. The U.S. Supreme Court has recognized that First Amendment values must often yield to other more important interests of society. Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981). A state's power to shield children from exposure to obscene or sexually explicit material is more expansive than its power to regulate the same material as to adults. Miller, supra, 93 S.Ct. at 2621 n. 17; Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 1281, 20 L.Ed.2d 195 (1968). Indeed, the state's interest in "safeguarding the physical and psychological well-being of a minor is compelling." New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 3354, 73 L.Ed.2d 1113 (1982).
Under the circumstances, the only truly effective way to prevent minors from gaining access to these obscene phone messages is to completely cut off Carlin's Dial-It service pending judicial review of a message that SCB has found objectionable. The fact is that these recorded messages *1214 are changed each day. Moreover, Carlin admittedly has no way of knowing whether the person calling its service is a minor. Therefore, to allow Carlin to continue using an objectionable message pending judicial review, as mandated by Freedman, would not provide sufficient protection for minors.
In conclusion, we hold that the SCB tariff does not impose an impermissible prior restraint on Carlin's freedom of speech. As a practical matter, Carlin obtained judicial review within three days; its service was terminated on Friday, May 4th, and a hearing was held on Monday, May 7th. Under the circumstances, this right to seek prompt judicial review adequately protects Carlin's constitutional rights without inhibiting the state's compelling interest in shielding minors from exposure to obscenity.

B. VAGUENESS AND OVERBREADTH
The challenge to the SCB tariff on the grounds of vagueness and overbreadth also must fail. A law is fatally vague and offends due process when it denies a person of ordinary intelligence a reasonable opportunity to know what action is prohibited so that he may act accordingly. Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Furthermore, laws regulating business behavior are held to a lesser standard of "definiteness" than statutes imposing criminal penalties. Village of Hoffman Estates v. Flipside, Hoffman Estates Inc., 455 U.S. 489, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982).
According to Miller, supra, the permissible scope of a statute regulating obscenity is limited to works depicting or describing sexual conduct, which conduct must be "specifically defined by the applicable state law, as written or authoritatively construed." 93 S.Ct. at 2615 (Emphasis added). Under these standards, the SCB tariff, which prohibits messages "of an obscene or sexually explicit nature," is not impermissibly vague. The trial court judge has already construed the tariff as prohibiting messages of the same type as "Plaintiff's Exhibit A," introduced at the first hearing, and permitting the so-called "mildly suggestive" messages that Carlin is presumably now using in New Orleans. Considering that these recordings are changed daily and are each about one minute in length, the trial judge's construction of the tariff is an adequate definition of what will be considered obscene. Because Carlin should now know what is prohibited, the tariff is not unconstitutionally vague.
Nor is the tariff overbroad. A regulation will be considered overbroad if it prohibits protected activities to a greater degree than is reasonably necessary to protect legitimate governmental interests. New York v. Ferber, supra, 458 U.S. at 769-72, 102 S.Ct. at 3361-63. SCB argues that the overbreadth doctrine is inapplicable here, because it does not apply to commercial speech. Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 1830 n. 24, 48 L.Ed.2d 346 (1976). We are not persuaded that these recorded messages are commercial speech, which is usually limited to advertising. Nevertheless, we find that the tariff is permissible under the reasoning of F.C.C. v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). In that case, the Supreme Court held that it was constitutional to prohibit the broadcast of a satyric radio monologue containing certain offensive words. Although the material was not found to be obscene, the Court held that it could be prohibited nevertheless because of the ease with which children could gain access to the broadcast. 98 S.Ct. at 3041. Thus, the Court recognized that a state may suppress expressions that are suitable only for adults (i.e., not obscene) because of the potential effect these expressions could have on children.
In the instant case, the trial judge has already found that these telephone recordings are obscene; we find no manifest error in this factual determination. Carlin argues that the SCB tariff is overbroad in *1215 view of the recent decision of the federal Second Circuit in Carlin Communications, Inc. v. Federal Communications Commission, 749 F.2d 113 (2nd Cir.1984), which held that the F.C.C.'s restriction of the hours during which "dial-a-porn" services may operate was unconstitutional. However, the federal court emphasized that, for purposes of its opinion, it was treating the communications as indecent rather than obscene, since there had been no finding of obscenity. Id. at 116. The court specifically noted that the F.C.C. has a much freer hand when regulating obscene speech, which is not protected by the First Amendment. Id. at 121. The federal case is therefore not dispositive of the instant situation, in which there has been a judicial determination of obscenity. The U.S. Supreme Court has made it clear that the determination of what constitutes obscenity is a matter of local concern, to be judged according to prevailing community standards. Miller v. California, supra, 413 U.S. at 32, 93 S.Ct. at 2619. For these reasons, we hold that the SCB tariff is not overbroad.

C. RIGHT OF PRIVACY
Relying on Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), Carlin asserts that the SCB tariff violates the constitutional right of privacy. In Stanley, the Supreme Court held that it was unconstitutional for a state to prosecute an individual for the mere possession of obscene literature in his home. We find appellee's contentions in this regard to be without merit. Even if Carlin has standing to assert its customers' rights of privacy, which is doubtful, the right of privacy must yield in this case to the state's compelling interest in protecting minors, which was not at issue in Stanley.

III. FEDERAL PREEMPTION
Federal preemption is deemed to occur when there is a clear manifestation of congressional intent to preempt the field or when there is a direct conflict between state and federal regulations. Jones v. Rath Packing Co., 430 U.S. 519, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Applying this standard, we find no federal preemption in this case.
The SCB Dial-It Service is clearly a local service, operating within the 504 area code, although long distance calls are not precluded. After hearing testimony on this issue, the trial judge determined, as a matter of fact, that this was an intrastate service. We find no manifest error in this determination.
In 1983, in response to a complaint filed after Carlin's Dial-It service first went on line in New York, the Federal Communications Commission amended the Communications Act of 1934 to provide, in pertinent part:
Whoever, knowingly
(A) in the District of Columbia or in interstate or foreign communication, by means of telephone, makes (directly or by recording device) any obscene or indecent communications for commercial purposes to any person under eighteen years of age to any other person without that person's consent, regardless of whether the maker of such communications placed the call; or
(B) permits any telephone facility under such person's control to be used for an activity prohibited by sub-paragraph (A), shall be fined not more than $50,000 or imprisoned not more than six months or both.
47 U.S.C. § 223(b)(1) (Emphasis added). As a companion to this statute, the F.C.C. issued a regulation providing that a defense to prosecution under § 223(b) would be that the defendant had attempted to restrict minors' access to its Dial-It service by operating only between the hours of 9 p.m. and 8 a.m. Eastern Standard Time. See 47 CFR § 64.201 (1984). However, the regulation was recently struck down by the U.S. Court of Appeals for the Second Circuit, which held that the F.C.C. had failed to demonstrate adequately that the same end could not be achieved more effectively by other, less restrictive means, such as screening or blocking calls, or requiring *1216 access numbers. Carlin, supra. The court indicated that the F.C.C. would be compelled to refrain from enforcing § 223(b) against Dial-It services until it had adopted another regulatory scheme as a counterpart to the statute. Id. at 121. Thus, although § 223(b) expresses an intent to prohibit the transmission of obscene or indecent telephone communications to minors, the F.C.C. is, at the present time, prevented from enforcing that statute against operators of Dial-It services.
Nevertheless, as the language of § 223(b)(1) clearly limits the regulation to "interstate or foreign communication," we can find no congressional intent to preempt state regulation of intrastate calls. Indeed, § 221 of the Act states that: "[N]othing in this chapter shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities or regulations for or in connection with wire, mobile, or point-to-point radio telephone exchange service....even though a portion of extreme service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a State commission or a local governmental authority." 47 U.S.C. § 221(b) (Emphasis added). Thus, it is clear that Congress did not intend the Act to be construed as applying to intrastate commerce unless it so states.
Furthermore, there is no conflict between state and federal regulations here. At the present time, because of the federal court decision, there is no federal regulation with which the SCB tariff could possibly conflict. The absence of such a conflict plus the fact that § 223(b) and the Act as a whole are clearly limited to interstate communications eliminate any possibility of federal preemption in this case. For these reasons, we find that the SCB tariff has not been preempted by federal law.

CONCLUSION
For the reasons stated above, we conclude that SCB's action in terminating Carlin's Dial-It service pursuant to its tariff was lawful. We therefore affirm the May 2, 1984 judgment of the trial court. We also affirm the May 8, 1984 judgment insofar as it orders Carlin's service to be reinstated, but we reverse that judgment insofar as it declares the SCB tariff unconstitutional and imposes penalties on Carlin for any future transmission of obscene messages. We find these penalties to be unnecessary because we hold that should Carlin ever again transmit a message which SCB deems to be obscene, SCB is authorized to disconnect Carlin's Dial-It service pursuant to its tariff.
AFFIRMED IN PART AND REVERSED IN PART.
REDMANN, C.J., dissents.
REDMANN, Chief Judge, dissenting.
The question in this case is whether a telephone company, admittedly obliged by state law and by constitutional theory to make available to all its communication lines, must similarly make available to all its accounting computers and telephone bill collection forces (including, presumably, cutting off all telephone service for nonpayment).
This is not a state action case. It is the telephone companynot the statethat has elected, in its tariff it filed with the state public service commission, to afford the use of its accounting computers and collection forces as its contribution to joint money-making ventures with some of its customers who use telephone answering devices to transmit messages that persons are willing to pay for (such as sports results). And it is equally the telephone companynot the statethat has elected, in the same tariff, not to afford the use of its accounting computers and collection forces for, and to terminate that use (not all telephone service) in the event of dissemination of, certain categories of recorded messages as to which the telephone company does not wish to be a joint venturer. The principle of Jackson v. Metropolitan Edison Co. controls: that is not state action.
*1217 Nor is this a freedom of speech case. Carlin Communications is as free as any other telephone subscriber with a telephone answering device to answer its telephone with recorded messages. It will remain that free, even if the telephone company refuses to use its accounting computers and collection forces to collect from telephone company customers the charges that Carlin would like to collect from those who call to hear Carlin's messages. Moreover, Carlin is free (and presumably economically able) to buy or rent its own computers to identify its millions of customers monthly and mail them bills, and it is free to cut off its own service to its customers who do not pay their bills. But Carlin has no "free speech" right to force South Central Bell to do so.
I would reverse the trial judge's ordering of South Central Bell to restore to Carlin the use of South Central Bell's computers and employees and the threat of cutting off all telephone service to Carlin's customers who do not pay Carlin's bills. Carlin had no claim to those services from South Central Bell except by its contract with South Central Bell, and that contract was lawfully terminated by South Central Bell in accordance with its terms.