Brassard, J.
The plaintiffs, The Boston Phoenix, Inc. and Tele-Publishing, Inc., brought this action against the defendant New England Telephone & Telegraph Co., a subsidiary of NYNEX Corp., challenging the defendant’s decision to deny certain telephone services to the plaintiffs based on the “adult” nature of personal ads in The Boston Phoenix’s newspaper of the same name. The plaintiffs claim: (1) Count I, Violation of the First and Fourteenth Amendment of the United States Constitution; (2) Count II, Violation of 42 U.S.C. §1983; (3) Count III, Violation of Article 16 of the Massachusetts Declaration of Rights; (4) Count IV, Violation of the Massachusetts Civil Rights Act; (5) Count V, Breach of Contract; (6) Count VI, Violation of the Tariff; (7) Count VII, Interference with Contract; (8) Count VIII, Discrimination by a common carrier under G.L.cc. 159 and 166; and (9) Count IX, Unfair and Deceptive Acts in violation of G.L.c. 93A. This matter is before this Court on the defendant NYNEXs motion for summary judgment as to all claims, and the plaintiffs’ crossmotion for summary judgment as to all claims except Count VIII, Discrimination. The issues have been extensively and well-briefed by the parties and others who submitted amicus briefs.[3] For the reasons set forth below, the parties motions for summary judgment are ALLOWED in part and DENIED in part.
BACKGROUND
The following facts are undisputed.
The defendant New England Telephone & Telegraph Co., d/b/a NYNEX Corp. (“NYNEX’ or “NET j, is a local exchange carrier authorized to provide telephone service within Massachusetts and other New England states. The plaintiff Boston Phoenix, Inc. (“Phoenix”) publishes a weekly newspaper by the same name that is circulated primarily in the Boston area. The plaintiff Tele-Publishing, Inc. (“TPI”), through arrangements with NYNEX and other telephone companies, provides interactive telephone communications services for use in conjunction with personal ads columns in the Boston Phoenix and other newspapers.
*548 A. Information Delivery Services
1. The DPU Proceedings
Pursuant to G.L.c. 159, NYNEX is a “common carrier” and its rates, regulations and practices are subject to review and approval by the Massachusetts Department of Public Utilities (“DPU”). On October 18, 1988, NYNEX filed with the DPU a proposed amendment to its tariff (‘Tariff’) which would allow it to introduce a service known as Information Delivery Service (“IDS”) to its service area within Massachusetts. Through IDS, businesses, known as Information Providers (IPs), provide recorded telephone messages which members of the public can access on a per minute or per call basis. Information messages are divided into two exchanges— 940 for “adult” and 976 for “general information” services. A third exchange, 550, already existed for Group Bridging Services (“GBS”), often referred to as “chat lines.” NYNEX proposed no means by which the “adult” 940 exchange could be blocked while retaining access to the other programs. Instead, NYNEX proposed to offer a Selective Blocking Service (“SBS”), which would provide a single comprehensive option to block all 940, 976 and 550 exchange numbers, regardless of content (“comprehensive blocking”).
NYNEX expected to offer to most IPs billing and collection services, which would involve keeping track of calls to an IP’s program, applying the IP’s rates to the messages, processing those rated messages into bill form, mailing customer bills, collecting payments, and remitting the balance after costs to the IPs. However, NYNEX proposed to exclude billing and collection terms from the Tariff in order to obtain complete discretion as to whom it would provide billing and collection services. NYNEX sought such discretion as a means to avoid becoming associated with IDS programming which, in its opinion, was “repugnant,” particularly those of an “adult” nature. NYNEX reasoned that if it were allowed to refuse billing and collection services to programming which it deemed “repugnant,” IPs would turn to other IDS-type services, such as those offered by long distance companies over the 1-900 exchange, rather than assume the burden of handling their own billing and collection under NYNEXs service. NYNEX characterized its proposed billing and collection policy as an effort to protect its corporate name and image. (See Deposition of David W. Burke, dated August 30, 1995, at 76, 80-81, 87.)
NYNEX is not the only provider of IDS-type services in Massachusetts. Prior to NYNEX’s proposal, long distance carriers such as AT&T, MCI and Sprint offered services substantially similar to IDS. These services, which, like IDS offered both “adult" and “general information” programs, all use the “1-900" exchange. Many IPs use both services, directing local callers to the 976 (or 940) number and long distance callers to the 1 -900 exchange. While NYNEX’s IDS is limited to local calls, the 1-900 exchange may be used for local as well as long distance calls. Finally, some IPs provide callers with the option of using a ” 1 -800" number to access many of the same programs available via IDS. The charge for these calls is paid by credit card directly by the caller to the IP, rather than through an intermediary such as NYNEX or AT&T.
On November 16, 1988, the DPU on its own motion suspended IDS for further investigation and opened a docket on the matter. The DPU granted the petitions of the Attorney General of Massachusetts (“AG”) and two private entities to intervene. There was concern among the intervenors that NYNEX’s proposed billing and collection policy would allow NYNEX to unfairly discriminate among IPs.
On January 11, 1989, the DPU held a public hearing to receive public comment on NYNEXs proposed tariff.[4] There was considerable concern voiced by members of the public to the effect that minors would have access to sexually-explicit messages if IDS were implemented. Members of the public requested that adult programming be prohibited on IDS unless sufficient blocking options were made available. The hearing officer at the public meeting, Patricia Crowe, questioned NYNEXs representative, David Burke, about these concerns. In response, NYNEX reasserted its position that the detariffing of billing and collection services would allow NYNEX the discretion to refuse billing and collection services to IPs whose recorded messages were of an “adult” nature. NYNEX anticipated that such IPs, rather than assuming the costs of billing and collection themselves, would choose not to use IDS and turn instead to other services, i.e. “1-900" numbers.[5]
The DPU and the AG at various times in January 1989 served information requests upon NYNEX, including questions regarding various blocking options, to which NYNEX responded. The DPU held eleven days of evidentiary hearings commencing on February 7, 1989 and ending on May 18, 1989. NYNEX and the AG each filed an Initial Brief with the DPU on June 12, 1989, and each filed a Reply Brief on June 16, 1989.
In its Initial Brief, the AG argued that “since there will be pornographic messages on IDS, consumers should be able to exclude this service from their homes and businesses.” AG Initial Brief at 7. The AG urged that the original SBS proposal, which offered a single comprehensive option blocking all IDS programs regardless of content, was inadequate to protect consumers. Id. The AG strongly urged that either the consumer be offered the additional option of requesting that the 940 exchange be blocked (“affirmative,” “voluntary” or “optional” blocking) or that the 940 exchange be automatically blocked unless the customer requests that it be unblocked (“presumptive” blocking). Id. The AG discussed presumptive blocking with approval and noted NYNEXs resistance to it. Id. at 7-8.[6] Ultimately, the AG proposed multiple voluntary blocking options: (1) 940 only, (2) 940 and 550, and (3) 940, 550, 976 and 1-900. Id. at 12.[7]
In its Initial Brief, NYNEX opposed any additional blocking options as “[unnecessary, [ejxtremely [c]ostly and [u]njustified” and continued to maintain *549 that its billing and collection proposal would adequately address public concerns regarding “adult” IDS programming. NYNEX Initial Brief at 58-59.[8] Notwithstanding its contention that additional blocking options were “unfounded,” NYNEX indicated its willingness to consider such blocking as a means of “allaying concerns expressed by the general public at the January 11,1989, public hearing regarding ‘adult’ services.” Id. at 60. NYNEX therefore suggested the addition of one 940 blocking option, either voluntary or presumptive. Id. at 60-62.[9]
In its Reply Brief, the AG stated that it was “pleased that NET revised its original SBS proposal to include either presumptive blocking or separate [voluntary] blocking of the 940 exchange. Of these alternatives, the Attorney General believes that presumptive blocking provides the most effective means of preventing minors from gaining access to pornography. The Attorney General therefore strongly urges the Department to adopt the Company’s proposal to presumptively block the 940 exchange." AG Reply Brief at 4.
In its Reply Brief, NYNEX again advocated for its proposed billing and collection policy, NYNEX Reply Brief at 2-3,[10] but reiterated its willingness to establish a presumptive 940 blocking scheme. Id. at 4-5.[11]
The DPU issued its Decision on July 31, 1989. In the Decision, the DPU noted NYNEXs willingness to establish presumptive 940 blocking and the AG’s support for such a measure. DPU Decision at 26-29. The DPU agreed with NYNEX and the AG that presumptive 940 blocking “would address many of the concerns expressed by members of the public” regarding “children’s access to pornographic messages if IDS were implemented.” Id. at 31. The DPU found that presumptive 940 blocking did not violate Constitutional guarantees of free speech stating that it was “among the least restrictive, and yet most effective, means of giving parents the ability to control unwanted access to ‘adult’ material by their children.” Id. at 31-32.[12] The DPU concluded, “Accordingly, we accept the Company’s 940 presumptive blocking proposal.” Id. at 32. The DPU ordered NYNEX to “revise its SBS tariff to include the following blocking procedures and options: Option (1): 940 only (presumptive); Option (2): 550, 900, and 940 (partial); and Option (3): 550, 900, 940, and 976 (comprehensive).” Id. at 34.
The DPU rejected NYNEXs proposed billing and collection policy, finding that it was unnecessary as a means to protect minors in light of presumptive 940 blocking, and dismissing NYNEXs claim that it needed the ability to refuse billing and collection services to certain IPs to protect its corporate image. Id. at 54.[13] In so doing, the DPU noted “the potential for undue discrimination inherent in such unbridled discretion.” Id. at 54 n.10.
2. The 940 Exchange
The Tariff, as ultimately approved by the DPU,[14] retains the exchange structure which uses the 976 exchange for “general information” and the 940 exchange for “adult” programming, with presumptive blocking of the 940 exchange. The Tariff defines “adult programs” in broad language and to include programs which are “sexually suggestive in any way.”[15] The assignment of exchange numbers is at the “sole discretion” of NYNEX, “based on the nature of the IDS announcement and its related advertising,” with no DPU review of NYNEX’s assignment decisions.[16] NYNEX provides billing and collection services for both 976 and 940 exchanges. NYNEX does not participate in the development of the content of the IDS programs.
NYNEX provides all applicants for IDS with an “IDS Vendor Guide,” which informs them of the above tariff requirements and provides examples of what NYNEX would consider “adult.” All IPs, including TPI, sign an application stating that they have reviewed the IDS Vendor Guide and NYNEX’s Tariff and that they agree to comply with their provisions.
In contrast to the 976 service, the 940 exchange has proven to be commercially unviable. Although NYNEXs customer base numbers in the millions, NYNEX has received only 550 requests for unblocking of the 940 exchange during the entire history of IDS, and only 19 of these were in the past five years. With a single exception, NYNEX has assigned eveiy recorded announcement program, regardless of content, to the 976 exchange throughout the history of IDS. The single exception involved an applicant which specifically requested the assignment to 940. That program lasted only 18 months on the 940 exchange and ceased operation in July 1992. In contrast to the approximately 90 programs on the 976 exchange, there are currently no programs operating on the 940 exchange. The record shows that while NYNEX provides the 940 exchange in accordance with the Tariff, as a practical matter it does nothing to inform the public of its existence or the means by which it can be unblocked, out of a concern that its corporate name and image not be associated with such “adult” programming.[17]
B. “Variations”
The Phoenix offers two types of personal classified ads (“personal ads”) services. The first generally involves individuals who seek long-term romantic relationships or friendships and is located in the main body of the Boston Phoenix newspaper. The second generally involves individuals who seek more casual sexual liaisons, often of an unconventional nature. This latter group of personal ads is contained in a section called “Variations,” formerly known as “Entre Nous,” which is located in a separate “Adult Entertainment” supplement to the Boston Phoenix newspaper. The Variations personal ads often make reference to certain body parts and sexual practices. The Variations section contains a notice to readers that “VARIATIONS are for adults 18 or over seeking specialized relationships.”
*550 In connection with both of these personal ad services, the Phoenix offers a service known as “Personal Call.” This service allows individuals who place personal ads to record a telephone message to which readers of the personal ads may listen and respond. After listening to the recorded message, responding individuals may, in turn, record their own messages to which the individuals who placed the personal ads may listen and respond. Callers are charged on a per minute basis. Personal Call allows various mediums by which individuals may access and respond to these recorded messages, including (1) a 976 telephone number on NYNEX’s IDS, (2) a 1-900 number on AT&T’s Multiquest service, (3) a non-IDS telephone number through which payment is made directly by credit card, and (4) the Internet. TPI provides the technical support for Personal Call. Since its inception in 1990, the Personal Call service, including those recorded messages resulting from the Variations personal ads, has been assigned to the 976 exchange.
Beginning in May 1994, NYNEX contacted various IPs regarding the “adult” content of their recorded messages and related advertising and required them to remove such content from their messages and advertising or face termination of their 976 service. These IPs complied but several complained about the “adult” content in the Variations personal ads related to the Phoenix’s Personal Call service and charged that the plaintiffs were receiving preferential treatment.[18] Thereafter, NYNEX began to object to the “adult” nature of the “Variations” personal ads as well as the corresponding IDS messages. The plaintiffs then removed the adult content from the IDS messages, but contested NYNEX’s right to consider the content of the “Variations” personal ads themselves. By letter dated January 4, 1995, NYNEX informed TPI that it would no longer provide 976 service in connection with the “Variations” personal ads because of the sexually-suggestive nature of the personal ads.[19] The letter also stated that TPI could reapply for service on the 940 “adult” exchange if it wished to do so.
The plaintiffs brought this action, and obtained a preliminary injunction which continues to the present time.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not have the burden of proof at trial, may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805 (1991), accord, Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue ofmaterialfactin order to defeat [the] motion.” Pederson, supra at 17. “[T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment.” LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
A. The Tariff
The plaintiffs allege in Count VI of their Complaint that NYNEX has acted in violation of its Tariff by assigning the Personal Call service to the 940 exchange based on the “adult” nature of the Variations personal ads. Since the terms of the Tariff form part of the contractual relationship between NYNEX and TPI, see Wilkinson v. New England Telephone & Telegraph Co., 327 Mass. 132, 135 (1951), the alleged breach of Tariff also gives rise to Count V, Breach of Contract.
The tariff gives NYNEX discretion to assign to the 940 exchange those IDS programs which it deems to be “adult” in nature. In determining what is “adult,” NYNEX may consider “the nature of the IDS announcement or program and its related advertising.” In this case, NYNEXs decision to assign Variations messages to the 940 exchange is based on the “adult” content of the Variations personal ads. There is no claim that the IDS messages themselves contain sexually-suggestive material. The issue here, therefore, is whether the Variations personal ads constitute “related advertising” under the Tariff, and thus form the basis upon which NYNEX may base its exchange assignment decision.
1. Jurisdiction
As an initial matter, it must be noted that questions of tariff interpretation are generally resolved, in the first instance, by the agency which approved the tariff, and not by the courts. Whitinsville Water Company v. Covich, 24 Mass.App.Ct. 925 (1987). Here, however, the DPU has expressly disavowed any review authority over NYNEX decisions as to which IDS messages to assign to the 940 exchange. Although there is evidence in the record that the DPU is aware of the dispute between the parties and that a representative of the DPU has attended their discussions, the DPU has thus far declined to become involved. At oral argument of these motions, the Phoenix, TPI and NYNEX agreed that all necessary parties were before the court. It is left to this Court, therefore, to determine whether NYNEX properly interpreted its Tariff in deciding to terminate 976 service based on the content of the Variations personal ads.
*551 2. Interpretation
A common carrier may not construe its tariff in an “unreasonable” manner. See New England Tel. & Tel Co. v. National Merchandising Corp., 335 Mass. 658, 664-65 (1957). In determining what is reasonable, this Court applies the same fundamental canons of construction which apply to all regulations and statutes. That is, “the regulation must also be interpreted according to the intent of the [officer or agency responsible for its promulgation] ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.” Knapp Shoe, Inc. v. Sylvania Shoe Mfg. Corp., 418 Mass. 737, 744 (1994)
The Phoenix publishes the Variations personal ads to the general public with the intent of generating calls to its Personal Call service. Indeed, each personal ad contains a telephone symbol and a four-digit code by which a reader can respond to the personal ad through the Personal Call service. Personal Call is the only means by which readers can respond to the Variations personal ads. Conversely, without the Variations personal ads, individuals would have no reason to access the Personal Call service. There can be little doubt, therefore, that the Variations personal ads and the Personal Call service are “related” and are indeed intertwined. The critical question is whether, under these circumstances, the Variations personal ads constitute “advertising” within the meaning of the Tariff.
An “advertisement” is “(n]otice given in a manner designed to attract public attention,” and to “advertise” is to “call a matter to the public attention by any means whatsoever.” Black’s Law Dictionary (6th ed. 1990) at 54. This is typically, but not necessarily, accomplished by an announcement which specifically references and “proclaim[s] the qualities” of the product, service or viewpoint. Smartfoods, Inc. v. Northbrook Property, 35 Mass.App.Ct. 239, 243 (1993). Thus,- in its broadest sense, “advertising” is public communication designed to attract attention to a particular product, service, viewpoint or other similar matter. Implicit in this definition of “advertising” is the existence Of an “advertiser,” who is somehow responsible for the communication and who intended the communication to promote a particular matter. Here, by publishing the Variations personal ads, the Phoenix advises its readers of what they can expect when they access the Personal Call service and enter the four-digit code which accompanies each personal ad. In effect, the publication of the Variations personal ads is a form of communication by which the Phoenix “proclaim[s] the qualities" of its Personal Call IDS program. It is reasonable to conclude that the Variations personal ads constitute “advertising” related to the Personal Call program.
The plaintiffs argue thatjust because the Variations personal ads require a particular medium of response, i.e. the Personal Call service, they do not constitute “advertising” for the Personal Call service, any more than a mail order catalog, which requires a response via mail, constitutes “advertising” for the U.S. Postal Service. This analogy fails because the U.S. Postal Service is not responsible for the mail order catalog and certainly has not designed the mail order catalog to induce the public to use the mail service. Nor is this Court’s conclusion altered by the fact that the Variations personal ads are written and paid for by those individuals who place them. The critical characteristic of “advertising” is that it is intended to attract attention to a specific matter, not the identity of the person who drafted or paid for such advertising. Finally, while the Variations personal ads clearly constitute “advertising” for those individuals who placed them, the ads nonetheless also serve as “advertising” for the plaintiffs’ IDS program as well.
This Court’s construction of “related advertising” is consistent with the Tariffs goal of protecting minors from access to “adult” IDS programming. Allowing NYNEX to base its exchange assignment decisions on “related advertising” serves the Tariffs goal of preventing minors from accessing “adult” IDS programming by facilitating the process by which NYNEX determines which programs are “adult” in nature. The Tariff assumes, not unreasonably, that “advertising” which is “adult” in nature accurately reflects the nature of the IDS program itself. Thus, where, as here, an IP publishes material which leads readers, including minors, to believe that the IP’s IDS program is “adult” in nature, NYNEX is entitled, under a reasonable construction of its Tariff, to treat the material as “related advertising” and to assign the IDS program to the 940 exchange to protect minors from the apparently “adult” content of the IDS program.
The fact that the plaintiffs have removed all sexually suggestive language from their Personal Call program does not, under the terms of the Tariff, insulate them from assignment to the 940 exchange. Once NYNEX determines that advertising related to an IDS program is “adult” in nature, it may assign that program to the 940 exchange. Nothing in the Tariff requires NYNEX to insure that the IDS program itself is “adult” in nature. Nor does anything in the Tariff preclude NYNEX from assigning that IDS program to the 940 exchange based on its related advertising, even where, as here, NYNEX has actual knowledge that the IDS program is devoid of “adult” content. NYNEX has interpreted the terms of the Tariff in a reasonable manner and consistent with the its plain language and intent.
Accordingly, the plaintiffs’ claims of breach of Tariff and breach of contract must fail.
B. First and Fourteenth Amendments and 42 U.S.C. §1983 claims
The plaintiffs argue that even if the Tariff, by its terms, allows the conduct at issue in this case, the assignment of the Personal Call IDS program to the 940 exchange based on the “adult” nature of the *552 Variations personal ads violates federal constitutional and statutory provisions. The plaintiffs therefore allege Count I, Violation of the First and Fourteenth Amendments of the United States Constitution and Count II, Violation of 42 U.S.C. §1983.
1. The state action requirement
An essential element of proof of each of the federal constitutional and statutory claims is that state action, rather than private action, caused the alleged constitutional violations. Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982); Jackson v. Metropolitan Edison Co., 419 U.S. 345, 349 (1974). “The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. . . Nor does the fact that the regulation is extensive and detailed, as in the case of most public utilities, do so . . . [T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.” Jackson, supra at 350-51. Accordingly, “a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State . . . Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment.” Blum v. Yaretsky, 457 U.S. 991, 1004-05 (1982) (and cases cited therein).
NYNEX urges that no state action is present in this case because it proposed 940 presumptive blocking “voluntarily” in response to public concerns and that the DPU merely acquiesced to this proposal. See Carlin Communication, Inc. v. Southern Bell Telephone and Telegraph Co., 802 F.2d 1352 (11th Cir. 1986). After extensive review of the administrative record, this Court disagrees. The record shows that NYNEX in its original proposal did not provide any blocking options to protect minors from “adult” IDS programming, and that NYNEX suggested such measures only after the DPU and the AG had taken up public concerns about minors’ access to “adult” IDS programming. Although NYNEX did eventually propose presumptive 940 blocking, it made clear its belief that its proposed billing and collection policy made 940 blocking unnecessary. In effect, NYNEX offered the presumptive blocking option only in the event that the DPU found that such blocking was truly necessary to allay public concerns. Thus, the DPU did more than simply approve the presumptive 940 blocking scheme. The DPU rejected NYNEX’s arguments in favor of its proposed billing and collection policy, agreed with the AG’s contention that additional blocking options were indeed necessary to allay public concerns, and affirmatively selected the presumptive 940 blocking option over the less restrictive voluntary blocking alternative.
State action may also be found where the private entity has exercised powers that are “traditionally the exclusive prerogative of the State.” Jackson, supra at 353. Applying this principle, the court in Carlin Communications v. South Central Bell Telephone Co., 461 So.2d 1208 (La.App. 1984), found state action where the defendant telephone company’s tariff allowed it to terminate an IDS-type service due to the sexually-explicit nature of the recorded messages. The record in that case demonstrated that the tariff provisions at issue arose from a desire to control access to sexually explicit material “by the general public, including minors.” Since the protection of minors from exposure to obscenity is ordinarily a state concern, the Louisiana court held that the telephone company had assumed a traditional state function. Id. at 1212.
In this case, the DPU expressly concluded that the presumptive 940 blocking scheme served the “legitimate interest in protecting minors from exposure to material potentially harmful to them.” (DPU Decision at 20.) To the extent that NYNEX acted pursuant to this interest in assigning the plaintiffs’ Personal Call service to the 940 exchange, it exercised a traditional state function, thereby implicating state action.
For these reasons, this Court holds that sufficient state action is present in this case to implicate the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983.
2. The substantive federal free speech right
Having determined that this case implicates the First and Fourteenth Amendments of the United States Constitution, as well as 42 U.S.C. §1983, this Court now addresses whether federal free speech rights have been violated in this case.
NYNEX contends that the speech in question is “commercial speech,” subject to a lower level of scrutiny than noncommercial speech. See Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 566 (1980). This is a questionable proposition, since a plurality of the Supreme Court has recently suggested that the lower level of scrutiny for commercial speech applies only when the regulation is intended to address “commercial harms,” e.g. to protect consumers from deceptive or overreaching advertisements. 44 Liquormart, Inc. v. Rhode Island, 116 S.Ct. 1495, 1508 (1996).[20]
In any event, this Court cannot agree that the presumptive 940 blocking scheme regulates “commercial speech.” Commercial speech is “speech proposing a commercial transaction.” Board of Trustees, State University of New York v. Fox, 492 U.S. 469, 473 (1989). In distinguishing between speech that proposes a commercial transaction and other varieties of speech, courts have applied a “common-sense” approach. Central Hudson, supra at 562. The Variations personal ads do have a commercial component in the sense that individuals pay a charge to place them and the Phoenix publishes these ads to encourage readers *553 to use the Personal Call service. At bottom, however, the Variations personal ads and the Personal Call recorded messages resulting from such ads are communications between individuals involved in the clearly noncommercial pursuit of personal relationships. The communications between these individuals are entitled to the full protection of the First Amendment. That protection cannot be abridged merely because a third party has a commercial interest in those communications.
The Supreme Court has set forth the applicable standard in Sable Communications of California, Inc. v. Federal Communications Commission, 492 U.S. 115 (1989): “Sexual expression which is indecent but not obscene is protected by the First Amendment. . . The Government may, however, regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest. We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors ... The Government may serve this legitimate interest, but to withstand constitutional scrutiny, ‘it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms ... It is not enough to show that the Government’s ends are compelling: the means must be carefully tailored to achieve those ends.” Id. at 126. In short, the government has a compelling interest in protecting children from indecent material, but that interest must be furthered by the least restrictive means in order not to violate the First Amendment.
The Tariff provisions in this case are restrictive in a number of ways. The presumptive 940 blocking scheme limits the availability of constitutionally-protected IDS messages to those who submit to NYNEX a written request for unblocking. The effectiveness of this approach depends not only upon the personal initiative of NYNEXs customers, but also upon NYNEXs willingness to inform its customers that 940 programs are available and how they may be accessed. If, as the record suggests is the case here, NYNEX customers are not aware of the 940 unblocking option, then the 940 exchange loses its viability. See footnote 17, supra. Even among customers who know of the unblocking option, the written notice requirement may well have a chilling effect upon those “who fear for their reputations should [NYNEX], adver-tently or inadvertently, disclose the list of those who wish” to hear the “adult” IDS messages. See Denver Area Educational Telecommunications Consortium, Inc. v. Federal Communications Commission, 64 U.S.L.W. 4706, 4713 (U.S. June 25, 1996) (citing Lamont v. Postmaster General, 381 U.S. 301, 307 (1965)). In turn, the potential for assignment to the 940 exchange would have a chilling effect on IPs who would otherwise include “adult” content in their IDS programs and related advertising.
NYNEX contends that these restrictions are nevertheless lawful, claiming that the presumptive 940 blocking scheme is the “least restrictive means” of realizing a “compelling state interest.” The Supreme Court has recently held that while the government may protect children from indecent material, “the government may not reduce the adult population . . . to . . . only what is fit for children.” Id. at 4715 (internal quotations omitted). “In promoting the morals of its youth by restricting their access to certain communications, the state may not create barriers which simultaneously place substantial restrictions upon an adult’s access to those same protected materials.” Fabulous Associates v. Pennsylvania Public Utility Commission, 693 F.Supp. 322, 335 (E.D. Pa. 1988). It is appropriate to inquire, therefore, whether there exists some alternative to presumptive 940 blocking which alternative would effectively protect minors but which would not be substantially less accessible to adults than the 976 exchange.
In this case, one option before the DPU during the administrative proceedings was voluntary or affirmative, rather than presumptive, blocking of the 940 exchange. Voluntary blocking is significantly less restrictive than presumptive blocking. With respect to the 940 exchange, it would give parents the ability to control their children’s access to adult IDS programming, without limiting the availability of that programming to adults. Voluntary blocking is the approach taken by the DPU with respect to the 1-900 and 550 exchange. The 1-900 exchange, employed by long distance carriers over telephone lines, often contains the same “adult” pre-recorded messages which NYNEX would assign to the 940 exchange. Similarly, the record indicates that “adult” language and situations can be found in the live chats accessed through the 550 exchange. While the DPU ultimately selected presumptive blocking of “adult” IDS programming, it was satisfied with voluntary blocking for the 1-900 and 550 exchanges. There is no basis in the administrative record before the DPU from which to determine why, if voluntary blocking is apparently sufficient to protect minors from “adult” content in non-IDS programs, the significantly more restrictive presumptive blocking option is necessary to protect against “adult” IDS programming. “At this point, we can take [the Tariffs] different, and significantly less restrictive, treatment of a highly similar problem at least as some indication that more restrictive means are not ‘essential’ (or will not prove very helpful).” Denver Area, supra at 4714 (emphasis original).
NYNEX contends that presumptive blocking is necessary because voluntary blocking protects children less effectively than presumptive blocking. Requiring parents to affirmatively request 940 blocking would leave “adult” IDS programs accessible to certain children, “including, say, children with inattentive parents.” Id. It is true, also, that voluntary blocking would not prevent a child from accessing “adult” IDS programs from other phones which have not been blocked. But “[n]o provision . . . short of an absolute ban can offer certain protection against assault by a *554 determined child. We have not, however, generally allowed this fact alone to justify ‘reduc[ing] the adult population . . . to . . . only what is fit for children.’ ” Id. at 4715 (quoting Sable, supra at 128). “(T]he fact that children may have indirect access to [indecent] communications provides no adequate justification for placing greater burdens on adults’ access to protected speech . . . Hence, where state-imposed restrictions unreasonably burden'the free speech rights of adults, parents must assume some responsibility for monitoring the messages accessed by their children.” Fabulous Associates, supra at 339 n. 14.
The Supreme Court has held that the appropriate response to such objections to voluntary blocking is a number of measures designed to insure the widespread use, and therefore effectiveness, of voluntary blocking by those who have children living in and visiting their homes. See Denver Area, supra at 4714-15 (technical shortcomings of “lockboxes” as a means to prevent minors’ access to adult cable programming “would seem to call, not for ‘segregate and block’ requirements, but, rather for” measures to increase the effectiveness of lockboxes). These would include measures to inform the public about voluntary blocking and to insure the ease by which voluntary blocking may be implemented. Such measures are already in place with respect to the voluntary blocking of the 1-900 and 550 exchanges. As required by the Tariff, NYNEX informs its customers of the existence of the voluntary blocking options through inserts accompanying bills, print advertising and through NYNEXs white pages directory. The Tariff also requires that current customers who call regarding IDS or the GBS “chat lines” be informed of their blocking options. The same requirement applies with respect to new customers ordering telephone service. A customer who wishes to exercise a voluntary blocking option may do so simply by calling NYNEX and need not submit a written request.
NYNEX last contends that this Court should defer to the DPU’s finding that presumptive 940 blocking was the “least restrictive means” of protecting minors from “adult” IDS programming. Such deference, however, “cannot limit judicial inquiry when First Amendment rights are at stake.” Sable, supra at 129. In any case, the DPU never made an explicit finding that presumptive 940 blocking was “the least restrictive means” of protecting minors from “adult” IDS programming (at most stating that it was “among” the least restrictive alternatives). Moreover, any such statement would have to have been supported by evidence not present in the record. In particular, the administrative record is devoid of any discussion by the DPU comparing and contrasting the effectiveness of voluntary 940 blocking relative to presumptive 940 blocking. On the record before this Court, there is no convincing explanation of why presumptive, rather than voluntary, 940 blocking is essential to accomplish the compelling state goal of protecting minors from “adult” IDS programs. See Sable, supra at 130 (“[T]he congressional record presented to us contains no evidence as to how effective or ineffective the FCC’s most recent regulations were or might prove to be”).
Accordingly, this Court holds that the 940 presumptive blocking violates the First and Fourteenth Amendments and 42 U.S.C. §1983.[21]
C. Article 16
The plaintiffs contend that even if there is no state action sufficient to implicate the United States Constitution and 42 U.S.C. §1983, they can still maintain their claim under Art. 16 of the Massachusetts Declaration of Rights. Because the Court concludes that there is state action in this case, it is not necessary for the Court to determine whether “state action” is a required element of an Art. 16 claim. The Court recognizes, however, that the state action issue is a close one and that an appellate court may disagree with this Court’s decision. It is appropriate therefore for the Court to address the Art. 16 issue.
“The Supreme Court of the United States has made it clear that a State may ‘adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.’ ’’ Batchelder v. Allied Stores International, Inc., 388 Mass. 83, 87 (1983) (quoting PruneYard Shopping Center v. Robins, 447 U.S. 74, 81 (1980)). The Supreme Judicial Court in Batchelder declined to address the plaintiffs claim that the defendant had also violated his right to free speech, stating, “we leave for another day the question of rights that may rise under art. 16 (free speech).”[22] Id. at 92. However, in holding that the absence of state action does not preclude a claim under Art. 9, which guarantees free ballot access,[23] the Supreme Judicial Court reasoned:
Unlike the prohibition of the First Amendment to the Federal Constitution (“Congress shall make no law . . .”) and the limitation of the Fourteenth Amendment (“nor shall any State deprive any person . . .”), art. 9 is not by its terms directed only against governmental action. There is, thus, no “State action” requirement expressed in art. 9, and we see no reason to imply such a requirement, and thereby to force a parallelism with the Federal Constitution . . . We . . . think that the distinction is significant and reject any suggestion that the Declaration of Rights should be read as directed exclusively toward restraining government action.
Batchelder, supra at 88-89. Since Art. 16,[24] like Art. 9, is, by its terms, not directed solely against government action, the Supreme Judicial Court’s reasoning in Batchelder suggests that it would, under the proper circumstances, protect the right to free speech even in the absence of state action.
The Court need not go so far in the instant case. With respect to Art. 12 (due process), in which state action is required, the Supreme Judicial Court has recognized that:
*555 this court may fashion its own concepts of due process of law under the Constitution of the Commonwealth and apply them within the permissible limits of the Constitution of the United States. . . . Thus, in determining what is State action for State due process of law purposes, we need not define State action as the Supreme Court of the United States has defined State action for Fourteenth Amendment and §1983 purposes.
Philips v. Youth Development Program, Inc., 390 Mass. 652, 658 (1983). Given the suggestion in Batchelder that Art. 16 may apply even in the absence of state action, it seems clear that the courts of Massachusetts may fashion under the Declaration of Rights broader concepts of free speech than those provided under the First Amendment. In so doing, this Court need not determine that state action is unnecessary under Art. 16, and may instead take the less drastic step of applying Art. 16 where state action is significant, but arguably insufficient to satisfy federal constitutional principles. See Philips, supra. Here, the involvement of the DPU and the AG in creating the 940 presumptive blocking scheme represents significant state action in a highly regulated area — telephone communication — which by its very nature is one of the principal vehicles of free speech in modern society. If this involvement falls short of satisfying the state action requirement under the federal constitution, this Court finds the involvement of the DPU and the AG sufficient to trigger Art. 16 analysis.
In determining whether the presumptive 940 blocking approach violates the state constitutional right to free speech, this Court applies the same test as articulated in Sable with respect to federal constitutional free speech rights, since violation of federal constitutional principles necessarily means a breach of the analogous state constitutional principles. For reasons already stated in Section B(2) of this decision, this Court holds that presumptive 940 blocking violates Art. 16.
To the extent that competing private rights are involved in an Art. 16 claim, Batchelder suggests that the right to free speech, particularly on private property “dedicated to the public as a practical matter,” must be weighed against the constitutional rights of others, such as the property rights of a shopping mall owner. Batchelder, supra at 92. Contrast Commonwealth v. Hood, 389 Mass. 581 (1983); Ingram v. Problem Pregnancy of Worcester, Inc., 396 Mass. 720 (1986). Against the plaintiffs’ right to engage in free speech over NYNEX’ telephone lines, which have certainly been “dedicated to the public as a practical matter,” NYNEX asserts the right not to have its corporate image associated with “adult” IDS programs and related advertising. In effect, NYNEX asserts the “right not to speak.” See Redgrave v. Boston Symphony Orchestra, 399 Mass. 93, 101-02 (1987) (Wilkins, J., concurring). As a practical matter, NYNEX is already associated with such “adult” programming through the 940 exchange. More importantly, there is no evidence that the plaintiffs’ views “could reasonably be attributed” to NYNEX. Batchelder, supra at 93. Indeed, the Court agrees with the ACLU’s observation that NYNEX simply provides the medium of public communication and is not generally seen as responsible for what is spoken over telephone lines. Contrast Redgrave v. Boston Symphony Orchestra, 855 F.2d 888 (1st Cir. 1988) (BSO’s choice of performers reflects on the BSO itself).
D. Remaining Claims
The plaintiffs’ remaining claims fail because they all require some element of wrongfulness on the part of NYNEX. This includes the plaintiffs’ claims of (1) Count IV, Violation of the Massachusetts Civil Rights Act, Freeman v. Planning Board of West Boylston, 419 Mass. 548, 564 (1995) (good faith but erroneous exercise of regulatory authority to obtain concession from plaintiff does not satisfy the “threats, intimidation or coercion” requirement under the MCRA);[25] (2) Count VI, Interference with Contract, United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812 (1990) (alleged interference must arise from “improper means or motive”); (3) Count VIII, Discrimination by a common carrier, G.L.c. 159, § 14 (prohibiting “unjustly discriminatory” practices) and G.L.c. 166, §14 (requiring telephone company to provide service “without discrimination”);[26] (4) Count IX, Unfair or Deceptive Acts in Violation of G.L. 93A.
These claims rely in large part on the contention that NYNEX has wrongfully characterized the Variations personal ads as “related advertising.” As this Court has already stated, however, the plain language of NYNEXs Tariff allows it to assign the Personal Call service to the 940 exchange based on the “adult” nature of the Variations personal ads, in accordance with the Tariffs state-mandated goal of protecting minors from “adult” IDS programming. While the Court has subsequently held that the presumptive 940 blocking scheme violates constitutional free speech principles, NYNEXs compliance with the Tariff is not, by itself, wrongful.
There is no evidence that the plaintiffs have been unfairly singled out. The record shows that NYNEX has enforced its Tariff provisions against other IPs whose advertising NYNEX has considered “adult.” There is no evidence that NYNEX employed a broader definition of “adult” with regard to other IDS programs and related advertising than with plaintiffs’ Personal Call service. While NYNEX has not sought to place IDS programs connected to personal ads in other newspapers in the 940 exchange, there is no evidence that the personal ads in these other newspapers are of the same nature as the Variations personal ads or can otherwise be deemed adult.
The plaintiffs note that prior to NYNEXs first objections regarding the Variations personal ads in October 1994, NYNEX had never enforced the Tariff against the Personal Call service based on the Variations personal ads. The plaintiffs also point to reports that NYNEX is developing products similar to those already offered by TPI, such as interactive telephone personals. The *556 plaintiffs infer from the timing of NYNEX’s objections and its future product plans that NYNEX’s effort to reassign the Personal Call service to the commercially unviable 940 exchange was intended to remove TPI as a potential rival. These claims are unfounded. The evidence indicates that NYNEX’s actions were prompted by complaints from other IPs who felt that NYNEX was unfairly ignoring the sexually-explicit language in the Variations personal ads and therefore giving the plaintiffs preferential treatment. Nothing in the record supports any other explanation. Moreover, the suggestion that NYNEX would find it in its business interest to intentionally abuse its authority and risk expensive litigation merely to rid itself of a single service of a single local potential rival strains credulity and amounts to nothing more than speculation.
In the absence of any wrongful conduct or motives on the part of NYNEX, the plaintiffs’s remaining claims must fail.
ORDER
For the foregoing reasons, it is hereby ORDERED that
(A) the defendant NYNEX’s motion for summary judgment as to (1) Count IV, Violation of the Massachusetts Civil Rights Act; (2) Count V, Breach of Contract; (3) Count VI, Violation of the Tariff; (4) Count VII, Interference with Contract; (5) Count VIII, Discrimination by a common carrier under G.L.cc. 159 and 166; and (6) Count IX, Unfair and Deceptive Acts in violation of G.L.c. 93A is ALLOWED and that the plaintiffs Phoenix’s and TPI’s crossmotion as to this claims is DENIED; and
(B) the defendants motion for summary judgment as to (1) Count I, Violation of the First and Fourteenth Amendment of the United States Constitution; (2) Count II, Violation of 42 U.S.C. §1983; (3) Count III, Violation of Article 16 of the Massachusetts Declaration of Rights is DENIED and the plaintiffs’ crossmotion as to these claims ALLOWED; and
(C) a declaratory judgment shall enter that the provisions in the Tariff relating to presumptive 940 blocking violate the rights of the plaintiffs guaranteed by the First and Fourteenth Amendments of the United States Constitution and Art. 16 of the Massachusetts Declaration of Rights.

The amici included the New England Legal Foundation, the American Civil Liberties Union, the Massachusetts Newspaper Publishers Association and the New England Newspaper Association.

Among those individuals who made statements were members of the legislature, religious leaders and concerned citizens; representatives of public interest groups such as American Family Association; Concerned Women for America of Massachusetts; Morality in the Media; and Family First Coalition.

The transcript of the public meeting shows the following exchange between Hearing Officer Crowe and NYNEX representative Burke at pages 58-61:
Q. So, if I am a mother with a teenage son and I call you up and I say, “Mr. Burke, I’m concerned. I don’t want my child to have access to what I consider to be pornographic or inappropriate material,” what would you tell me I could do to protect my son?
A. Well, in one of the data responses I think I responded in regard to whether we would expect any significant amount of the revenues associated with IDS or the billing and collection services associated with IDS to flow from . . . so-called adult services. I indicated in that response that I thought that those revenues would be negligible, and that most, if not all, of the providers of those services would not choose to use IDS, they would use other network services that already exist today and in fact are available to the people of Massachusetts today.
Q. Mr. Burke, I’m still a mother and I’m still concerned.
Can you tell me that, by not billing and collecting, you’re going to cut off access to all adult services?
A. What I’m saying is that, in regard to the billing and collections associated with IDS, New England Telephone has adopted an approach whereby that billing and collection service will not become another vehicle for those kinds of services to the people of Massachusetts. Now, those services exist today via the telephone network via normal toll service, and billing and collection for those services are done in many cases by credit card. That exists today, whether IDS is introduced or whether it is not.
New England Telephone’s approach in regard to its billing and collection service would forestall the use of the billing and collection service as another vehicle for that.
After further discussion on related issues, the following exchange took place on page 76 of the Transcript:
Q. Let me make sure I understand here. There’s a content issue about adult services; isn’t that correct?
A. Yes.
Q. Some of the members of the public are concerned about the availability of these so-called adult services; isn’t that correct?
A. That’s correct.
Q. You’re saying that, because NET is not going to bill and collect for these services, that alleviates the issue; is that correct?
A. I believe to a great degree that it does.

“In a number of other jurisdictions, local telephone companies have voluntarily proposed a system of presumptive blocking as a way of dealing with the massive administrative burdens associated with ‘adult’ services . . . [Wjhen questioned by the Attorney General about the possibility of following [these companies’] lead and implementing presumptive blocking, Mr. Burke deferred asserting that NETs billing and collection policy would solve the problem. This witness stated: We did not proceed with that approach because I think there was pretty general consensus that the proper way to approach that was not to get into an issue of blocking, but to not — to obtain the necessary discretion in regard to the billing and collection service, so that, in effect, the vehicle itself, at least the billing vehicle, for those kinds of services would not be available, and therefore there would not be the need to block on a specific-service basis.’ ”

“In light of the fact that NET has not voluntarily proposed presumptive blocking for adult services, the Attorney General proposes three separate blocking options:
940,
940 and 550, and
*557 940, 540 [sic], 976 and 900.
These options would provide customers with an appropriate degree of choice between services . . . Those parents who wished to cut off their children’s access to pornography, but not Group Bridging or IDS could do so. Those parents who equated Group Bridging with ‘adult’ services would be able to block access to both 940 and 500 [sic]." Id.

“The Attorney General has argued that the customers should have additional blocking options available to them in addition to the generic [comprehensive] SBS option. That argument is without merit and is unsubstantiated by the record in this case for the following reasons . . .
“Mr. Burke testified that additional blocking options for IDS are unnecessary since he expects that IPs of ’’adult" programs will probably not subscribe to IDS due to the Company’s proposed billing policy. As [previously] described . . . that policy would permit NET to refuse billing services for ‘adult’ programs, thereby disassociating itself from that type of programming. Mr. Burke testified that without the billing feature of IDS, such IPs would probably not use IDS as a vehicle for their type of programming. Rather, those IPs would use alternative services, such as interstate 900 ... to offer their ‘adult’ programs." Id. (internal citations omitted).

“Despite the considerable expense associated with additional blocking options and the apparent lack of need for multiple blocking variations, the Company would consider adding one blocking option (i.e., an [sic] 940 only blocking option). The Company believes that a 940 blocking option is unfounded due to its proposed billing policy, as [previously] described . . . IPs providing ‘adult’ and other services for which NET will not bill would not be attracted to IDS. Nevertheless, a separate 940 blocking option may serve the public interest by allaying concerns expressed by the general public at the January 11, 1989, public hearing regarding ‘adult’ services.
“Alternatively, the Company would support a ‘presumptive’ 940 blocking approach, whereby NET would block access to the 940 exchange from all residence and business lines. The evidence in this case demonstrates that the Company’s proposed Billing and Collection tariff and SBS would adequately protect the public’s concerns regarding adult services. Nevertheless, the Company has concluded that to meet the expressed needs of members of the public concerned with adult services, it will support this option and require that the 940 NNX be blocked and opened only at the customer’s request.
“Having heard the public’s concerns regarding pornography and the impact that such concerns may have on the Company’s image and reputation, the Company now supports the presumptive blocking approach. The Company is committed to offering IDS while at the same time preventing the use of this service for ‘adult’ or other offensive programs. This solution should meet any concerns of the Attorney General and the Department with regard to the adequacy of SBS.” Id. (emphasis original).

“[T]he Company believes that there is no demonstrated need to introduce multiple blocking options in Massachusetts. This is due, in large part, to the Company’s proposed billing policy, which would enable NET to not bill for those programs, such as ‘adult’ services, which are offensive or repugnant and may, therefore, harm the Company’s corporate image and public reputation. Without NETs billing and collection services, information providers (’IPs’) may simply choose not to offer ‘adult’ services using IDS. Instead, those IPs could utilize various other competing alternatives, including interstate 900 services, as the preferred vehicles for ‘adult’ programs. If IPs choose not to offer ‘adult’ services on the IDS 940 exchange, the AG’s concern that customers be given the choice of selectively restricting access from their telephone lines to adult services on the 940 exchange, while preserving access to other 976 IDS programs, becomes a moot point. Therefore, the Company’s ability to exercise billing discretion would, in effect, satisfy the AG’s concerns regarding ‘adult services’ on IDS.”

 “Although the Company does not believe that multiple blocking options in addition to SBS are necessary, NET has recognized the public concern expressed at the Department’s public hearing in this docket. Accordingly, in its Initial Brief, NET proposed to offer a separate [voluntary] 940 blocking option . . .
“Alternatively, the Company supports a presumptive 940 blocking approach ... by which NET would presumptively restrict access to the 940 (adult services) exchange from all telephone lines. Customers who desire access to such services would then formally request that the Company unblock their lines. The Company’s willingness to offer either a separate optional 940 blocking arrangement or a presumptive 940 blocking approach would adequately satisfy the concerns of the consumers the AG claims to protect."

“[I]t is unnecessary to reach the question of state action . . . [T]he right to free speech does not preclude reasonable regulations designed to protect minors from material that may be harmful to them, so long as the restrictions do not unreasonably limit access to the material by adult audiences. Presumptive blocking allows adults to secure access to the material in question while preventing casual access on the part of minors, beyond the reasonable control of concerned parents.
“Presumptive blocking is among the least restrictive and yet most effective, means of giving parents the ability to control unwanted access to ‘adult’ material by their children
“. . . Presumptive blocking, then, appears well tailored to balance the compelling interest in parental control over their children’s access to ‘adult’ material with the right of free speech.”

“Because NET proposes to block access to the 940 or ‘adult’ exchange presumptively... the Department finds that it is unnecessary for NET to have discretion in billing for selected IPs. Under NETs proposal.. . NET must necessarily be associated to some degree with the existence and content of the 940 exchange. Accordingly, the Department finds unpersuasive the Company’s argument that it needs the ability to refuse to bill certain IPs to protect its corporate image.
“Based on the findings in this Order that permit NET to place adult programming on a separate 940 exchange and to require presumptive blocking of the 940 exchange, the Department finds no necessity for NET to maintain an exclusive right to deny billing and collection services. Accordingly, we find that NET must provide billing and collection service to all IPs.”

In September 1995, an amended version of the Tariff became effective. The IDS provisions, however, remained substantially the same.

Paragraph 9.7.2 of the Tariff provides: “Adult programs include those which are ‘adult’ or sexually suggestive in any way or contain matter which, in the sole discretion of the Company [NYNEX], implicitly or explicitly invites, describes, stimulates, excites, arouses, or otherwise refers to sexual conduct or innuendo.”

Paragraph 9.7.3.E provides, in relevant part: “The assignment of a telephone number for an IDS program is at the sole discretion of the Company and may be based on the nature of the IDS announcement and its related advertising. There is no Department of Public Utilities review regarding the Company’s decision on the assignment of programs to the 940 exchange.”
*558 Paragraph 9.7.3.G of the Tariff states: “The Company reserves the right to change the number of any IDS announcement based on the nature of the announcement or its advertising.”

For example, the Deposition of Michael W. Varkas, dated September 18, 1995, states the following:
Q: And why do you think that a program with adult advertising would have a negative effect on NETs overall positive image?
A: NYNEX does not choose to be involved in adult services. It’s not the type of programs or theme we believe would be received well with our general customer base.
Q: Do you know how many programs are currently assigned to 940?
A: No.
Q: At any point in time, have you inquired of anyone as to how many programs are assigned to the 940 exchange?
A: No.
Q: The 940 exchange is within you area of responsibility, isn’t that right?
A: Yes.
Q: Why is it that you’re not concerned about the number of customers that use 940 . . .?
A: The reason is because NYNEX has no intention to take any action proactively to improve, increase the 940 service
Q: Would you be disappointed to find that there were no programs that used 940?
A: No.
Q: Why not?
A: I have no interest in developing the 940 service.
Q: Do you know whether NET advertises the 940 category in any way?
A: We do not.
Id. at 99-101.

For example, Richard Cohen, President of National Telephone Enterprises, Inc., an IP using NYNEX’s 976 service, wrote in a letter to NYNEX’s David Burke, dated October 21, 1994: “When I first started 976 in Boston, Mr. Garvey [a NYNEX representative] and myself discussed various categories that were permissible. The conversation resulted in the removal of the more liberal choices that I offer in other cities. I have always conformed to the guidelines set down by Mr. Garvey and am still doing so. In May, I noticed that the Boston Phoenix’s Variations column, which utilizes 976 and is probably your biggest customer, was using language that I was not permitted to use. I then wrote to Mr. Garvey to express my concerns.”

NYNEX continued to provide 976 service in connection with the other personal ads not contained in the “Variations” section.

“[T]he State may regulate some types of commercial advertising more freely than other forms of protected speech. Specifically . . . the State may require commercial messages to ‘appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive.” 44 Liquormart, Inc. v. Rhode Island, 116 S.Ct. 1495, 1505-06 (1996). It is not true, however, “that all commercial speech regulations are subject to a similar form of constitutional review simply because they target a similar category of expression. The mere fact that messages propose commercial transactions does not in and of itself dictate the constitutional analysis that should apply to decisions to suppress them.” Id. at 1507. “It is the State’s interest in protecting consumers from ‘commercial harms’ that provides the ‘typical reason why commercial speech can be subject to greater governmental regulation than noncommercial speech.’. . . Yet bans that target truthful, nonmisleading commercial messages rarely protect consumers from such harms. Instead, such bans often serve only to obscure an ‘underlying governmental policy’ that could be implemented without regulating speech.’ ” Id. at 1508.

The plaintiffs also raise the claim that the term “adult" as defined in the Tariff is unconstitutionally vague and overbroad. The Court notes that many, if not all, of the Variations personal ads would be included in any reasonable construction of the Tariffs definition of “adult.” However, the Court would agree that the language in the definition is decidedly vague, particularly the reference to “matter which . . . implicitly . . . refers to sexual . . . innuendo." In light of this Court’s decision on the substantive free speech issues, however, the Court need not address this issue.

The Supreme Judicial Court, however, was not entirely silent on Art. 16. First, the Court rejected language in previous case law stating that “the protections of art[]. 16 extend no further than the comparable provisions of the First Amendment.” Batchelder, supra 89-90 n.8 (quoting Commonwealth v. Noffke, 376 Mass. 127, 134 (1978)). Second, the Supreme Judicial Court noted with apparent approval cases in which various state courts of last resort found in their respective state constitutions a right to orderly exercise of free speech on private property. Id. at 90 (discussing State v. Schmid, 84 NJ 535 (1980) and Commonwealth v. Tate, 495 Pa. 158, 173 (1981)).

Article 9 of the Massachusetts Declaration of Rights states: “All elections ought to be free; and all inhabitants of this Commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employment.”

Article 16 of the Massachusetts Declaration of Rights provides: 'The liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this commonwealth. The right of free speech shall not be abridged.”

The parties disagreed at length over the proposition that mere economic coercion, absent any physical force, may constitute “threats, intimidation or coercion” under the MCRA. The Supreme Judicial Court has observed that “the Massachusetts Civil Rights Act was enacted in response to deprivations of secured rights by private individuals using violence or threats of violence amounting to racial harassment. Our cases holding that the Massachusetts Civil Rights Act was violated have involved actual or potential physical confrontations involving a threat of harm." Planned Parenthood League of Massachusetts v. Blake, 417 Mass. 467, 473-74 n.8 (1994) (citing Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 95 (1987)). Nevertheless, the Supreme Judicial Court has continued to “assume without deciding that certain forms of oppression or domination not involving physical force might constitute coercion under the Act.” Freeman, supra at 566 n.18 (citing United States v. Beaty, 288 F.2d 653, 654-58 (6th Cir. 1961) (enjoining the use of economic pressure to coerce black residents from voting)). This issue need not be resolved here.

In light of the Court’s holding, the Court need not consider NYNEX’s assertion that this the discrimination claim should be remanded to the DPU.